# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

NASSER MUSTAPHA KAROUNI,
                    *Petitioner,*

v.

ALBERTO GONZALES,* Attorney
General,
                    *Respondent.*

No. 02-72651

Agency No.
A75-530-521

OPINION

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted
April 1, 2004—Pasadena, California

Filed March 7, 2005

Before: Alfred T. Goodwin, Harry Pregerson, and
Richard C. Tallman, Circuit Judges.

Opinion by Judge Pregerson

---

*Alberto Gonzales is substituted for his predecessor, John Ashcroft, as
Attorney General. Fed. R. App. P. 43(c)(2).

## COUNSEL

Douglas D. Nelson, San Diego, California, for the petitioner.

Luis E. Perez (argued), Deborah N. Misir (briefed), Office of Immigration Litigation, Civil Division, Department of Justice, Washington, D.C., for the respondent.

## OPINION

PREGERSON, Circuit Judge:

Nasser Mustapha Karouni ("Karouni"), a native and citizen of Lebanon, petitions for review of a decision of the Board of

Immigration Appeals ("BIA") that denied his application for both asylum and withholding of removal. The BIA affirmed without opinion a decision of the Immigration Judge ("IJ") that found that Karouni failed to show that he was persecuted in the past, or that he had a well-founded fear of future persecution.

Because the evidence compels the conclusion that Karouni has a well-founded fear of future persecution if he were removed to Lebanon, we grant Karouni's petition for review.

## I. BACKGROUND[1]

Karouni is a native and citizen of Lebanon, who first entered the United States in 1987 on a multiple-entry, non-immigrant visitor for pleasure visa.[2] In March 1998, Karouni timely filed an application for asylum with the Immigration and Naturalization Service ("INS").[3] *See* 8 C.F.R. § 1208.4(a)(2) (requiring all applications for asylum to be filed within one year after arrival in the United States or one year after the Illegal Immigration Reform and Immigrant Responsibility Act's ("IIRIRA"), Pub. L. No. 104-208, 110 Stat. 3009 (Sept. 30, 1996), April 1, 1997, effective date,

---

[1]The following facts are taken as true because the IJ found Karouni to be credible, and the BIA made no findings of its own. *See Rodriguez-Matamoros v. INS*, 86 F.3d 158, 159 (9th Cir. 1996).

[2]In 1988, Karouni was convicted for a hit and run vehicle accident when a motorcycle hit him from behind, but he left the scene. In 1994, he was convicted of grand theft of property when he removed plates from art books at a public library. Because these convictions are not the basis for Karouni's removability, they would be totally irrelevant to these proceedings, except, as discussed below, the IJ found that they were examples of behavior that an individual who feared future persecution would not likely commit. *See infra* Part III(A)(3)(f).

[3]The INS ceased to exist on March 1, 2003, when its functions were transferred to the Department of Homeland Security. *See Homeland Security Act of 2002*, Pub. L. No. 107-296, 116 Stat. 2135. However, we refer to the agency as the INS here because the proceedings in this case were instigated before the transfer.

whichever is later). On September 14, 1998, in response to Karouni's asylum application and because Karouni over-stayed his visa, the INS placed Karouni in removal proceedings by issuing a Notice to Appear.

At a November 30, 1998, hearing before an IJ, Karouni conceded removability, renewed his application for asylum, and additionally sought withholding of removal and voluntary departure. On March 30, 1999, the IJ held an evidentiary hearing at which Karouni testified and both Karouni and the INS submitted documentary evidence. Karouni testified that he feared that he would be persecuted if removed to Lebanon because he is a homosexual, suffering from AIDS, and Shi'ite.

To understand the context of Karouni's testimony concerning the persecution he fears if removed to Lebanon, we begin with a discussion of the social, religious, political, and cultural climate facing homosexuals in Lebanon as established by the evidence in the record and considered by the IJ.

Karouni grew up in the southern Lebanese province of Tyre. According to Karouni's testimony and a July 1996 report from the United Nations High Commission Refugees, the south of Lebanon, including Tyre, is largely controlled by an Islamic paramilitary organization named "Hizballah."[4] "Hizballah applies Islamic law in areas under its control." Bureau of Democracy, Human Rights, and Labor, United States Dep't of State, *1997 Country Report on Human Rights*

---

[4]Since 1997, Hizballah has been designated a Foreign Terrorist Organization by the Department of State. *See* 62 Fed. Reg. 52650 (Oct. 8, 1997); 64 Fed. Reg. 55112 (Oct. 8, 1999); 66 Fed. Reg. 51088 (Oct. 5, 2001); 68 Fed. Reg. 56860 (Oct. 2, 2003). In his January 29, 2002, State of the Union Address, President George W. Bush specifically mentioned Hizballah as part of a "terrorist underworld" that threatens United States interests. *The State of the Union Address by the President of the United States*, 148 Cong. Rec. H98-05 (daily ed. Jan. 29, 2002) (statement of Pres. Bush).

*Practices — Lebanon* (Jan. 30, 1998), *available at* http://
www.state.gov/www/global/human_rights/1997_hrp_report/
lebanon.html. Under Islamic law, homosexuality is "hadd" —
that is, according to Karouni, "punishable by death." *See, e.g.,*
Jin S. Park, Comment, *Pink Asylum: Political Asylum Eligi-
bility of Gay Men and Lesbians Under U.S. Immigration Pol-
icy*, 42 UCLA L. Rev. 1115, 1143-44 (1995) ("The most
severe forms of punishment are found in countries that apply
the Islamic Law, Sharia, which impose the death penalty after
four convictions of consensual homosexual activity.").

It is not entirely clear from the record whether the Hizbal-
lah operates beyond the Lebanese government's control or
with its complicity. Nevertheless, the record is clear that the
Lebanese government condemns homosexuality. For exam-
ple, Karouni submitted Reuters and UPI news articles noting
that Lebanon boycotted the 1994 International Conference on
Population Control because the conference's agenda recog-
nized homosexuality, which is "vehemently condemned by
the country's Christian and Muslim religious leaders."
Karouni also submitted an excerpt from a book on interna-
tional gay and lesbian liberation and oppression, which quotes
the Lebanese Embassy in the Hague as stating that "homosex-
uality is not accepted in Lebanon." Even Karouni's family,
who, except for his sister, does not know that he is gay,
"agrees that [homosexuality] is a 'crime' which deserves
strong punishment."[5]

---

[5]According to Karouni, he decided not to tell the rest of his family that
he is gay because, in addition to their belief that homosexuality is a crime,
he wishes to protect them from being ostracized. As Karouni stated in his
asylum application,

> if someone outside the family learned of my homosexuality, then
> my family might be socially ostracized, discriminated against by
> fundamentalists and the government and any remaining protec-
> tion or status due to their position in society would be lost. My
> family would be forced to ostracize me in order to avoid persecu-
> tion so that they do not lose standing in the government and soci-
> ety.

The record is also quite clear that the Lebanese government, or at least local governments within Lebanon, attempt to curb homosexual conduct through oppressive state action. For example, Karouni submitted to the IJ six articles published in the Lebanese newspaper "Nahar" between 1991 and 1993 which indicate collectively that various Lebanese police forces had arrested dozens of young men for practicing homosexuality. He also submitted a 1994 Reuters article in which a Beirut Police Major was reported to have said that he was leading a "moral brigade" and "combatting a wave" of homosexuality in Beirut by placing homosexuals in "rehabilitation programs." Against this backdrop of systemic intolerance, and on the basis of his own experiences and those of his homosexual peers, Karouni fears persecution if removed to Lebanon.

Karouni stated in his asylum application that he has "always been gay." As a youth in the late-1970s, Karouni and his cousin, Ramsey Khaleil ("Khaleil"), spent time together secretly meeting other gay men. Sometime between the late-1970s and 1984, Khaleil's family learned that Khaleil was gay and ostracized him. In 1984, Khaleil was shot in the anus at his apartment, apparently by the Hizballah because he was gay. Khaleil survived the injuries but, in 1986, was shot to death at his apartment, again apparently by the Hizballah.

Karouni has also been the subject of anti-gay animus. In Fall 1984, two men armed with machine guns, "dressed in militia garb," and identifying themselves as members of the Amal Militia,[6] interrogated and attempted to arrest Karouni at his apartment after they learned that Karouni had been involved in a homosexual relationship with a man named Mahmoud. Karouni stated in his asylum application, "I was told to confess to the crime of homosexuality. They told me

_____

[6]After Israel's 1982 invasion of Lebanon, radical members of Amal dissatisfied with many of Amal's moderate practices formed the Hizballah. *See, e.g.,* Sami G. Hajjar, *Hizballah: Terrorism, National Liberation, or Menace?* 5 (2002).

to name other homosexuals. They asked me whether I knew the names of other persons they suspected of being homosexual. I was very frightened. . . . I nervously feigned ignorance." An armed neighbor and friend of Karouni's interrupted the encounter and prevented the militia-men from arresting Karouni. According to Karouni's asylum application, "The men finally left yelling derogatory terms at me. They said that the Koran condemns persons like me."

Mahmoud was not as fortunate as Karouni: he was arrested and beaten by Amal militia-men, and Karouni never saw him again. According to Mahmoud's cousin, Toufic, Mahmoud "repented" to the authorities and "chose to follow God" by returning to a heterosexual life. Karouni believes that Mahmoud told the authorities that Karouni is gay. After Karouni's encounter with the militia-men at his apartment, he avoided his apartment for a couple months and started "playing a straight life" by dating women.

In 1987, shortly after Khaleil's murder, Karouni finally fled Lebanon for the United States because, in his words, "life was intolerable" and he "was living in fear every moment of [his] life." Nevertheless, Karouni was compelled to twice return to Lebanon. In 1992, Karouni returned to Lebanon to see his father, who was dying of cancer, but out of fear of persecution returned to the United States before the funeral. In 1996, he returned to Lebanon to visit his mother, who was ill. He delayed his trip out of fear of persecution and, by the time he arrived in Lebanon, his mother had died.

Karouni generally avoided going out in public while in Lebanon during his 1992 and 1996 visits but in 1992 attended a handful of (i.e., three or four) private dinner parties, arranged by Toufic, with other homosexuals. After Karouni returned to the United States, he learned through his sister, aunt, friends, and Lebanese newspapers that at least three of the friends with whom he dined were arrested, detained, beaten, and/or killed because they were gay. One of these

friends, Andre Baladi, was arrested by Lebanese police because he is gay. Baladi was jailed, beaten, and interrogated for names of other homosexuals. He cooperated with the authorities and told them what he knew. Karouni learned that during the interrogation, Baladi "outed" Karouni as a gay man. About five months after Baladi's encounter with the police, another one of Karouni's friends, Hassan, was jailed, beaten, and interrogated by the police. Karouni believes that Hassan was outed to the police by Baladi. Thus, Karouni fears that, if removed to Lebanon, he would be identified and persecuted for having associated with these homosexual friends. Indeed, Karouni testified that Toufic confirmed that Karouni's name was given to the Hizballah militants who persecuted his homosexual friends, and a declaration from a Lebanese doctor submitted by Karouni to the IJ confirmed that "Karouni's homosexuality is no secret among certain circles in Lebanon."

Karouni also fears persecution because he has AIDS. According to Karouni, there is functionally nobody in Lebanon from whom he can seek treatment for his disease. Doing so, according to Karouni, would require him to admit that he is infected. Admitting that he is infected would, in turn, confirm suspicions that he is gay. According to a letter by another Lebanese doctor submitted by Karouni to the IJ, "AIDS in Lebanon is still looked upon as, firstly, a stamp of verification of homosexuality, and secondly, as the deserved punishment from God. . . . The unavailability of medical treatment . . . further depicts the level of discrimination against individuals with AIDS." Additionally, Karouni testified that he has read articles in the Lebanese press indicating that people who are known to have AIDS are put under "house arrest" and receive no treatment for their disease.

Finally, Karouni testified that he would be unlikely to live in anonymity if returned to Lebanon because of his family's prominence and that this exacerbates his fear of persecution. In particular, Karouni's father was a successful international businessman and landowner who had nightly meetings with

the Lebanese Cabinet. Karouni's great-uncle, Adel Osseiran, was the head of the Lebanese Parliament and, akin to our own John Hancock, is famous in Lebanon for signing the documents that gave Lebanon its independence from France in 1943. Karouni believes that his family name, "Karouni Osseiran," is so recognizable that it identifies him as both a member of a prominent family and a Shi'ite. According to Karouni, since the 1975 Lebanese civil war, many Islamic fundamentalists view wealthy Shi'ite landowners as enemies *per se* and target them for no reason other than that they are Shi'ite and landowners. Being gay and a descendant of prominent Shi'ite landowners, in Karouni's view, is a double-edged sword because the prominence of his family's name would make it much more difficult for him hide from his would-be persecutors, who — the evidence strongly suggests — already know that he is gay.

On March 30, 1999, the IJ denied Karouni's request for asylum, withholding of removal, and voluntary departure. Karouni was ordered removed. The IJ found Karouni to be a credible witness. The IJ also recognized that Karouni presented documentary evidence "to show that individuals in Lebanon are prosecuted for homosexual conduct." But the IJ found that Karouni was, nonetheless, not entitled to relief because he had not established that he was persecuted in the past, and did not demonstrate a well-founded fear of future persecution.

Specifically, the IJ found that Karouni had not established that he was persecuted in the past because "[t]he only item of *possible* past persecution . . . is . . . that in 1984 he was interrogated by two armed men of the Hizballah militia." With respect to Karouni's fear of future persecution, the IJ found that Karouni's testimony was "full of supposition and devoid of supporting facts."

Karouni timely appealed to the BIA, which on July 19, 2002, summarily affirmed the IJ. This timely petition for review followed.

## II.  STANDARD OF REVIEW[7]

We review the BIA's decision that an alien has not established eligibility for asylum or withholding of removal to determine whether it is supported by substantial evidence. *Wang v. Ashcroft*, 341 F.3d 1015, 1019-20 (9th Cir. 2003); *see also Monjaraz-Munoz v. INS*, 327 F.3d 892, 895 (9th Cir. 2003) ("We review the BIA's findings of fact, including credibility findings, for substantial evidence and must uphold the BIA's finding unless the evidence compels a contrary result."). When, as here, the BIA affirms an IJ's decision without opinion, we review the IJ's decision, which constitutes the final agency determination. *See He v. Ashcroft*, 328 F.3d 593, 595-96 (9th Cir. 2003).[8]

## III.  ANALYSIS

### A.  *Asylum*

#### 1.  *Statutory Requirements*

[1] The Attorney General may grant asylum to an alien who qualifies as a refugee — that is, one who is unable or unwilling to return to their home country because of "persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. §§ 1101(a)(42)(A), 1158(b)(1). Persecution is " 'the infliction of suffering or harm upon those who differ (in race, religion, or political opinion) in a way regarded as offensive.' " *Prasad v. INS*, 47 F.3d 336, 339 (9th

---

[7]Karouni's appeal is governed by the permanent provisions of the IIRIRA because immigration proceedings were initiated after April 1, 1997. *See Kalaw v. INS*, 133 F.3d 1147, 1149-50 (9th Cir. 1997).

[8]Karouni argues that the BIA erred by affirming without opinion the decision of the IJ. We reject this argument because it is foreclosed by *Falcon Carriche v. Ashcroft*, 350 F.3d 845, 849-50 (9th Cir. 2003), which we decided after Karouni filed his opening brief.

Cir. 1995) (quoting *Desir v. Ilchert*, 840 F.2d 723, 726-27 (9th Cir. 1988)). "Persecution need not be directly at the hands of the government; private individuals that the government is unable or unwilling to control can persecute someone" for purposes of asylum. *Singh v. INS*, 134 F.3d 962, 967 n.9 (9th Cir. 1998) (citing *Sangha v. INS*, 103 F.3d 1482, 1487 (9th Cir. 1997)).

**[2]** "An alien's 'well-founded fear of persecution' must be both subjectively genuine and objectively reasonable." *Nagoulko v. INS*, 333 F.3d 1012, 1016 (9th Cir. 2003) (citing *Duarte de Guinac v. INS*, 179 F.3d 1156, 1159 (9th Cir. 1999)). Karouni's credible testimony satisfies the subjective component. *See Njuguna v. Ashcroft*, 374 F.3d 765, 770 (9th Cir. 2004). To satisfy the objective component, an alien must show that he has suffered from past persecution or that he has a " 'good reason to fear future persecution by adducing credible, direct, and specific evidence in the record of facts that would support a reasonable fear of persecution.' " *Nagoulko*, 333 F.3d at 1016 (quoting *Duarte de Guinac*, 179 F.3d at 1159).[9]

### 2.   *"On account of race, religion, nationality, membership in a particular social group, or political opinion"*

**[3]** As noted in the preceding section, to qualify for asylum, Karouni must establish that the future persecution he fears would be on account of one of the five statutory grounds: "race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. §§ 1101(a)(42)(A), 1158(b)(1). The Attorney General does not dispute that, as a general matter, homosexuals constitute a "particular social group" within the meaning of the Immigration and Naturalization Act ("INA"). Indeed, it would be difficult for the Attorney General to do so.

---

[9]Karouni does not take issue with the IJ's finding that he did not suffer past persecution. As a result, Karouni may qualify for asylum only by establishing a well-founded fear of future persecution. *See Nagoulko*, 333 F.3d at 1016.

"[A] 'particular social group' is one united by a voluntary association, including a former association, *or* by an innate characteristic that is so fundamental to the identities or consciences of its members that members either cannot or should not be required to change it." *Hernandez-Montiel v. INS*, 225 F.3d 1084, 1093 (9th Cir. 2000). In *Matter of Taboso-Alfonso*, 20 I. & N. Dec. 819 (BIA 1990), the BIA upheld an IJ's determination that a Cuban gay asylum applicant had established membership in a particular social group defined by the status of being homosexual. *See id.* at 822-23. In 1994, the Attorney General designated *Taboso* "as precedent in all proceedings involving the same issue or issues." Att'y Gen. Order No. 1895-94 (June 19, 1994).

[4] Two years later, the INS recognized that "in certain circumstances . . . persons with HIV or AIDS may constitute a particular social group under refugee law." Memorandum from David A. Martin, INS Office of General Counsel (Feb. 16, 1996), *reported in* 73 Interpreter Releases 909, 909 (July 8, 1996). And shortly thereafter, the INS formally adopted the "position . . . that homosexuals *do* constitute a particular social group."[10] Memorandum from David A. Martin, INS General Counsel, to All Regional and District Counsel (Apr. 4, 1996) (emphasis added), *available at* http://www.lgirtf.org/newsletters/Fall96/FA96-14.html.[11] The position of the State

---

[10]According to the International Gay and Lesbian Human Rights Commission, from 1994 to 1999, the Attorney General granted asylum to about 300 gays and lesbians. *See* Denise C. Hammond, *Immigration and Sexual Orientation: Developing Standards, Options, and Obstacles*, 77 Interpreter Releases 113, 118 (Jan. 24, 2000).

[11]The Attorney General would be hard-pressed to retreat from the position adopted by the INS' April 4, 1996, memorandum without offering a compelling reason to do so. "[I]f the INS departs from an announced rule without explanation or an avowed alteration, such action could be viewed as arbitrary and capricious, [or] an abuse of discretion." *Amanfi v. Ashcroft*, 328 F.3d 719, 728 (3d Cir. 2003) (internal quotations omitted)); *see also Morton v. Ruiz*, 415 U.S. 199, 235 (1974) ("Where the rights of individuals are affected, it is incumbent upon agencies to follow their own

Department appears to be in accord with the INS' position. In 2000, the State Department asserted that "[n]othing in international law can justify the persecution of individuals on the basis of sexual orientation." Statement of U.S. Ambassador Nancy Rubin on Protection of Vulnerable Groups, Before United Nations Commission on Human Rights, April 13, 2000, *available at* http://www.humanrights-usa.net/2000/item14.html.

Later in 2000, in *Hernandez-Montiel*, we confronted for the first time a variation of the issue whether homosexuals constitute a "particular social group" within the meaning of the INA. In that case, the "primary issue we . . . decide[d] is whether gay men with female sexual identities in Mexico constitute a protected 'particular social group' under the asylum statute." *Hernandez-Montiel*, 225 F.3d at 1087. We answered that question in the affirmative, concluding "as a matter of law, [that] the appropriate 'particular social group' is that group in Mexico made up of gay men with female sexual identities." *Id.* at 1091, 1094-95. Though the issue presented in *Hernandez-Montiel* was narrowly cast to encompass only "gay men with female sexual identities in Mexico," *id.* at 1087, 1091, *Hernadez-Montiel* clearly suggests that *all* alien homosexuals are members of a "particular social group" within the meaning of the INA.[12] *See id.* at 1094 (stating that

procedures."); *Church of Scientology of Cal. v. United States*, 920 F.2d 1481, 1487 (9th Cir. 1990) (noting that "an administrative agency is required to adhere to its own internal operating procedures" and analyzing, in this framework, an Internal Revenue Service ("IRS") policy statement in the Policies of the IRS Handbook); *Nicholas v. INS*, 590 F.2d 802, 806-08 (9th Cir. 1979) (dealing with an INS operations instruction).

[12]Since we decided *Hernandez-Montiel*, the Third Circuit has impliedly recognized that homosexuals constitute a "particular social group." *See Amanfi*, 328 F.3d at 727-30. The Eighth Circuit has assumed, without deciding, that "homosexuals are a particular social group." *Molathwa v. Ashcroft*, 390 F.3d 551, 554 (8th Cir. 2004) (citing *Hernandez-Montiel*, 225 F.3d at 1094).

"sexual orientation can be the basis for establishing a 'particular social group' for asylum purposes"); *cf. generally Reyes-Reyes v. Ashcroft*, 384 F.3d 782 (9th Cir. 2004) (remanding to the BIA case in which the IJ applied incorrect legal standards to Convention Against Torture and withholding of removal claims of El Salvadorian homosexual male with female sexual identity). Thus, to the extent that our case-law has been unclear, we affirm that *all* alien homosexuals are members of a "particular social group."

[5] While the Attorney General does not dispute the general proposition that homosexuals constitute a "particular social group," the Attorney General nevertheless argues that the future persecution Karouni fears would not be on account of his *status* as a homosexual, but rather on account of him committing future homosexual *acts*. For example, the Attorney General asserted at oral argument before us that "the government of Lebanon arrest[s] people because they have engaged in homosexual acts, but not[ ] . . . for merely being homosexual."[13] There are significant problems with the Attorney General's argument. First, there is no guarantee that Karouni would not be persecuted even if, upon his return to Lebanon, he never again engaged in a homosexual act. If the Lebanese authorities and the Hizballah already believe, as the evidence in the record strongly suggests,[14] that Karouni has already

---

[13]The IJ posited, but did not rely on, a similar justification for denying Karouni relief from removal. The IJ stated in his oral decision that

> [t]here seems to be conflicting documentation concerning the current conditions in Lebanon as they relate to homosexuals. The respondent seems to indicate that Islamic law prevails in Lebanon with regard to certain social aspects such as homosexuality. There has been evidence to show that individuals are prosecuted for homosexual conduct. [But t]here has been no evidence that mere homosexuality is against the law in Lebanon.

[14]For example, Karouni's Fall 1994 encounter with armed Amal militia-men in his apartment strongly suggests that Karouni has been "outed" as a gay man. We can surmise no reason why, if Karouni was not suspected of being a homosexual, armed Amal militia-men came to his apartment to interrogate him about being a homosexual. We discuss other evidence that Karouni has already been "outed," *infra*, in Part III(A)(3)(b) of this opinion.

engaged in homosexual acts in the past, it does not matter whether he engages in any homosexual acts in the future. Karouni, as we discuss in greater detail below, *see infra* Part III(A)(4), by virtue of his past homosexual acts alone, would certainly face "at least a ten percent chance that he will suffer persecution." *El Himri v. Ashcroft*, 378 F.3d 932, 936 (9th Cir. 2004) (noting that even a ten percent chance that the applicant will be persecuted in the future is enough to establish eligibility for asylum).

**[6]** Alternatively, even if there were a guarantee that Karouni would not be persecuted for his past homosexual acts, the Attorney General appears content with saddling Karouni with the Hobson's choice of returning to Lebanon and either (1) facing persecution for engaging in future homosexual acts or (2) living a life of celibacy. In our view, neither option is acceptable. As the Supreme Court has counseled, "[w]hen sexuality finds overt expression in intimate conduct with another person, the conduct can be but one element in a personal bond that is more enduring." *Lawrence v. Texas*, 539 U.S. 558, 567 (2003). This is but one reason why "the[ ] sexual identities [of homosexuals] are so fundamental to their human identities that they should not be required to change them." *Hernandez-Montiel*, 225 F.3d at 1094. By arguing that Karouni could avoid persecution by abstaining from future homosexual acts, the Attorney General is essentially arguing that the INA requires Karouni to change a fundamental aspect of his human identity, *id.*, and forsake the intimate contact and enduring personal bond that the Due Process Clause of the Fourteenth Amendment protects from impingement in this country and that "ha[ve] been accepted as an integral part of human freedom in many other countries," *Lawrence*, 539 U.S. at 577; *cf. United States v. Marcum*, 60 M.J. 198, 208 (2004) (recognizing that United States military "servicemembers clearly retain a liberty interest to engage in certain intimate sexual conduct"). We do not agree with the Attorney General that the INA requires Karouni to change "an innate characteristic . . . so fundamental," *Hernandez-Montiel*, 225 F.3d at

1094, or to relinquish such an "integral part of [his] human freedom," *Lawrence*, 539 U.S. at 577. Accordingly, we see no appreciable difference between an individual, such as Karouni, being persecuted for being a homosexual and being persecuted for engaging in homosexual acts. The persecution Karouni fears, regardless of how it is characterized by the Attorney General, qualifies as persecution on account of . . . Karouni's membership in the particular social group of homosexuals. *See* 8 U.S.C. § 1101(a)(42)(A).

### 3.  *The IJ's Insufficiently Supported Findings*

The IJ made a handful of findings on which he based his determination that Karouni did not have an objectively well-founded fear of future persecution. For the reasons below, we believe that none are not supported by substantial evidence.

### a.  The Shooting of Khalil in the Anus and His Subsequent Murder.

The IJ found that Karouni failed to provide evidence to corroborate that Hizballah militants were responsible for shooting his cousin, Khalil, in the anus and later killing him. Specifically, the IJ asked Karouni if he had proof that Hizballah militants were responsible or that Khalil was shot and killed because he was gay. Karouni explained that there were no newspaper accounts or police reports[15] attributing Khalil's shooting and murder to the Hizballah or to Khalil's homosexuality. Karouni also explained that in Lebanon's cultural, political, and legal climates, Khalil's shootings were not likely to be publicly attributed to Khalil's homosexuality or to the Hizballah.

**[7]** The IJ's faulting of Karouni for his failure to provide

---

[15]With respect to Khalil's first shooting, Karouni specifically explained in his asylum application that "[t]he police investigated but dropped the case because he was gay."

corroborative evidence is not a substitute for substantial evidence. "Because asylum cases are inherently difficult to prove, an applicant may establish his case through his own testimony alone." *Garrovillas v. INS*, 156 F.3d 1010, 1016-17 (9th Cir. 1998) (internal quotation marks and citation omitted); *see also* 8 C.F.R. § 1208.13(a) ("The testimony of the applicant, if credible, may be sufficient to sustain the burden of proof without corroboration."). Once an applicant's testimony is deemed credible — as Karouni's testimony was deemed here — no further corroboration is required to establish the facts to which the applicant testified. *See Kaur v. Ashcroft*, 379 F.3d 876, 890 (9th Cir. 2004).

Moreover, Karouni's testimony that Khalil was likely shot in the anus and later killed by the Hizballah because he was gay finds support in the record. As discussed earlier, Karouni submitted to the IJ a substantial amount of evidence establishing (1) that the Hizballah has a military presence throughout Karouni's home region in the South of Lebanon; (2) that the Hizballah applies Islamic law in that region; (3) that homosexuality is punishable by death under Islamic law; and (4) that the Hizballah and Lebanese state officials have arrested, beaten, and in some cases killed known or suspected homosexuals. *See supra* Part I. Karouni also submitted evidence suggesting that Muslim militia-men in Lebanon regularly use their firearms to sexually assault and torment suspected homosexuals. In particular, Karouni submitted a BIA opinion from a similar immigration case involving a Lebanese homosexual, in which Muslim militia-men repeatedly forced the barrel of a rifle into the homosexual asylum-seeker's anus.

"We have repeatedly held that asylum applicants [do not] bear . . . the unreasonable burden of establishing the exact motives of their persecutors . . . ." *Ali v. Ashcroft*, 394 F.3d 780, 785 (9th Cir. 2005). For this reason, a persecutor's identity and/or motivation may be established by direct *or circumstantial* evidence. *See INS v. Elias-Zacarias*, 502 U.S. 478, 483 (1992). Circumstantial evidence may include, *inter alia*,

"[o]bvious signs" connecting persecutory acts to the alleged persecutors and suggesting the alleged persecutors' motives. *See Deloso v. Ashcroft*, 393 F.3d 858, 865 (9th Cir. 2005).

**[8]** In this case, we agree with Karouni that shooting Khalil in the anus is essentially *res ipsa loquitor* evidence, *see* Petitioner's Opening Brief, *available at* 2003 WL 22724486, at *20, or an "[o]bvious sign[ ]," *see id.*, that Khalil was shot because he was a homosexual. We can conceive of no explanation why members of a society hostile to homosexuality would shoot Khalil in the anus other than that the perpetrators primitively and abhorrently believed that they were punishing Khalil for his perceived sins by mutilating, as Karouni characterized it, "the locus of Khalil's homosexual sin." Karouni's arguments and testimony, when read with the other evidence in the record, support his conclusion that Khalil was likely shot in the anus and later killed by the Hizballah because he was gay. *Cf. Navas*, 217 F.3d at 657 ("In some cases, the factual circumstances alone may provide sufficient reason to conclude that acts of persecution were committed on account of . . . [a] protected ground[ ]. Indeed, this court has held persecution to be on account of [a protected ground] where there appears to be no other logical reason for the persecution at issue." (internal citation omitted)); *Ratnam v. INS*, 154 F.3d 990, 995 (9th Cir. 1998) ("[I]f there is no evidence of a legitimate . . . purpose for a government's harassment of a person . . . there arises a presumption that the motive for the harassment is [on account of a protected ground]." (internal citation omitted)).

### b.  Whether Karouni Has Been "Outed" to the Authorities

The IJ faulted Karouni for failing to provide evidence to corroborate that he had been identified as a homosexual to the authorities by either his former homosexual partner, Mahmoud, or the friends with whom he attended dinner parties in Lebanon in 1992. This finding is not supported by substantial

evidence either. First, Karouni *did not* speculate that he has been identified to the authorities as a homosexual. Rather, Karouni testified that his friend and Mahmoud's cousin, Toufic, told him that his name had been submitted to the authorities as a homosexual. The IJ stated that Karouni should have obtained affidavits from Toufic or other friends in Lebanon to corroborate Karouni's testimony. However, requiring Karouni to obtain corroborating affidavits, as noted above, runs afoul of our case law recognizing that, when an applicant presents credible testimony — as Karouni did here — "[n]o further corroboration is required." *Salaam v. INS*, 229 F.3d 1234, 1239 (9th Cir. 2000) (internal quotations omitted).

Additionally, as we noted earlier, *see supra* note 14, Karouni's Fall 1984 encounter with armed Amal militia-men in his apartment refutes the IJ's suspicion that Karouni has not been "outed." We can surmise no reason why, if Karouni was not suspected of being a homosexual, armed Amal militia-men came to his apartment to interrogate him about being a homosexual.

**[9]** Finally, even if corroborative evidence was required — which it is not — Karouni *did* provide documentary evidence that tends to corroborate his testimony that he had been identified by the Lebanese authorities as a homosexual. Karouni provided a declaration from a Lebanese doctor, Dr. Mobassaleh, who attended the American University of Beirut with Karouni and shared Karouni's network of homosexual friends. Dr. Mobassaleh's declaration states that "Karouni's homosexuality is no secret among certain circles in Lebanon, despite all his efforts to keeping it so." For this reason, Dr. Mobassaleh declared, "I very much fear for Mr. Karouni's life and safety in Lebanon." While Dr. Mobassaleh's declaration is not clear as to precisely who knows of Karouni's homosexuality, Dr. Mobassaleh's remark that individuals know "*despite all [Karouni's] efforts*" indicates that at least some of the individuals who know of Karouni's homosexuality are individuals who Karouni would not want to know of it. We

find this ambiguity of little practical consequence because, as the evidence in the record establishes, Karouni's would-be persecutors appear sufficiently capable of sleuthing-out their victims. That Karouni's homosexuality is "no secret" in Lebanon places him sufficiently at risk of future persecution for his fear to be well-founded.

### c.  Karouni's Two Return Visits to Lebanon

The IJ also found that Karouni's returns to Lebanon in 1992 to attend to his dying father and in 1996 to attend to his dying mother "cut against" his claim of fear of future persecution in Lebanon because these actions "do[ ] not appear to be the actions of an individual who fears persecution because he is gay." In certain cases, a petitioner's return to the country in which he or she fears persecution may undercut the petitioner's claim that his or her fear is objectively well-founded. *Compare Bereza v. INS*, 115 F.3d 468, 474 (7th Cir. 1997) (six- to seven-month return visit to Ukraine without incident supported BIA's finding that petitioner did not have a well-founded fear of future persecution), *with Damaize-Job v. INS*, 787 F.2d 1332, 1336 (9th Cir. 1986) (two-year return to Nicaragua motivated by desire to assist uncle and sister who had been arrested by Sandinistas not supportive of BIA's finding that petitioner lacked well-founded fear). This, however, is not such a case.

Unlike *Bereza*, in which the petitioner experienced no problems on his *six- to seven-month* return to Ukraine just one year after fleeing to the United States, *see Bereza*, 115 F.3d at 470, Karouni's 1992 and 1996 return visits to Lebanon lasted only approximately *two months and one month*, respectively. In both instances, Karouni returned to Lebanon only because his parents were dying. Out of fear of persecution, Karouni cut short his 1992 visit and returned to the United States before his father's funeral. Likewise, out of fear of persecution, Karouni delayed his 1996 visit, and, by the time he arrived in Lebanon, his mother had already died.

**[10]** Faced with the difficult choice of returning to Lebanon to see his dying parents or remaining in the safe haven of the United States, we do not fault Karouni for his choice to return to Lebanon to see his parents one last time. Accordingly, we do not believe that Karouni's two return visits to Lebanon constitute substantial evidence that his fear of persecution was not well-founded. *See Damaize-Job*, 787 F.2d at 1336.[16] Rather, the IJ's conclusion to the contrary was "personal conjecture" about what choice someone in Karouni's unfortunate position would have made. *Paramasamay v. Ashcroft*, 295 F.3d 1047, 1052 (9th Cir. 2002) (rejecting IJ's hypothesis as to what motivated the applicant's departure from Sri Lanka). "An immigration judge's personal conjecture 'cannot be substituted for objective and substantial evidence.' " *Id.* (quoting *Bandari v. INS*, 227 F.3d 1160, 1167 (9th Cir. 2000)).

### d. Karouni's Attendance at Dinner Parties with Other Homosexuals

The IJ found that Karouni's attendance at dinner parties with other homosexuals in Lebanon in 1992 was inconsistent with the actions of an individual who feared being "outed." Like so many of the IJ's other findings in this case, we believe that this finding also represents the IJ's "personal con-

---

[16]We also find support in the wealth of our case law recognizing that a well-founded fear of future persecution will not be negated by an alien's continued presence in the country in which he or she fears persecution before fleeing. *See, e.g., Gonzalez v. INS*, 82 F.3d 903, 909 (9th Cir. 1996) (noting that there is no "rule that if the departure was a considerable time after the first threat, then the fear was not genuine or well founded"); *Turcios v. INS*, 821 F.2d 1396, 1401-02 (9th Cir. 1987) (remaining in El Salvador for several months after release from prison did not negate fear); *Damaize-Job*, 787 F.2d at 1336 (two-year stay in Nicaragua after release not determinative). For the purposes of evaluating an alien's fear of future persecution, so long as compelling circumstances motivated the alien's actions, we find little practical difference between an alien's delay in departing his or her home country and briefly returning home. In this case, the impending demise of Karouni's parents presents a sufficiently compelling circumstance.

jecture" as to what someone in Karouni's situation would do.
*Id.*

Karouni's credible testimony establishes that, during his
1992 visit to Lebanon, he limited his contacts and remained
at his parents' home most of the time. He interacted with only
family and close friends for fear that his would-be persecutors
would learn of his presence and persecute him. The evidence
in the record strongly suggests that Karouni attended dinner
parties with other homosexuals *only* because he believed them
to be safe. In particular, Karouni testified that his friend and
Mahmoud's cousin, Toufic, arranged the dinner parties, that
all of the attendees of the dinner parties were "very close
friends" of Toufic's, and that "[t]hey've known each other for
years." Accordingly, we find no support for the IJ's conclu-
sion that Karouni, at the time that he attended the dinner par-
ties in 1992, had any reason to fear that his attendance would
place him at a greater risk of persecution or that his atten-
dance somehow evidences an objectively unreasonable fear of
future persecution.

Moreover, Karouni attended dinner parties with other
homosexuals during his 1992 visit to see his dying father but
*not* during his 1996 visit to attend his recently deceased moth-
er's funeral. Karouni testified that, after his 1992 visit to Leb-
anon, he "started hearing [that] the people I associated with
. . . [in 1992 ha]ve been arrested and beaten." Toufic told
Karouni that, following the arrests of the other dinner party
attendees, Karouni's name "ha[d also] been submitted" to the
Lebanese authorities identifying him as a homosexual. For
that reason, during Karouni's 1996 visit to Lebanon, he did
not attend any dinner parties with other homosexuals, "re-
mained at home as much as possible," and "didn't want to get
in contact with anybody." Thus, to the extent that the IJ was
correct in speculating that a gay man in fear of being outed
and persecuted would not have attended dinner parties with
other homosexuals, Karouni's actions during his 1996 visit
were entirely consistent with the IJ's supposition.

### e. Karouni's Contact with an Immigration Lawyer in 1987

The IJ found that Karouni's contact with an immigration lawyer in 1987 to determine if Karouni could legalize his immigration status was "somewhat unusual" because Karouni did not seek asylum until a decade later and never attempted to obtain derivative immigration status from his brother who is a United States citizen. This finding is not supported by substantial evidence either and again constitutes nothing more than the IJ's speculation and conjecture as to what someone in Karouni's position would have done.

Karouni testified that, in 1987, when he spoke with an immigration lawyer, Karouni did not independently know, and his lawyer did not tell him, that he could obtain derivative legal resident status from his brother or that asylum was available to him. Karouni also testified that, in 1987, he focused on obtaining lawful permanent resident status in the United States *through his work*. That the IJ found it hard to believe that an immigration lawyer would fail to explore all of Karouni's options for obtaining lawful status in the United States is nothing more than the IJ's generalization about what a knowledgeable and thorough immigration attorney should have done. Again, it is well-settled in this circuit that an IJ's speculation and conjecture cannot substitute for substantial evidence. *See, e.g., Paramasamy,* 295 F.3d at 1052. And we have already held that an IJ may not speculate as to why an alien did not apply for asylum immediately upon entry to the United States. *See Guo v. Ashcroft*, 361 F.3d 1194, 1201-02 (9th Cir. 2004). In any event, Karouni's decade long delay in seeking asylum is also reasonable, given that he was unaware that he was even eligible for it and attempted to obtain lawful immigrant status through other means — namely, his work.

### f. Karouni's Two Criminal Convictions

Finally, the IJ found that Karouni's two criminal convictions in the United States "demonstrat[e] doubt" about

Karouni's fear of future persecution because "[o]ne who fears return to their home country would certainly shy away from any criminal conduct in the United States." Again, this finding represents nothing more than impermissible speculation and conjecture by the IJ. We have never — and as far as we can tell, no court has ever — held that an alien's objective fear of persecution can be disestablished by the alien's commission of crimes — in Karouni's case, two misdemeanors — while in the United States. We decline to impose that condition on an alien's fear of future persecution.

### 4. *Karouni's Well-Founded Fear of Future Persecution*

**[11]** In sum, the IJ's finding that Karouni lacked a well-founded fear of future persecution is not supported by substantial evidence. To the contrary, the evidence establishes that Karouni has both a subjectively and objectively well-founded fear of future persecution. After all, "even a ten percent chance of persecution may establish a well-founded fear." *Al-Harbi v. INS*, 242 F.3d 882, 888 (9th Cir. 2001).

Here, the record demonstrates that Hizballah militants and certain factions of the Lebanese and local governments are a credible threat to homosexuals like Karouni. Karouni has established that he has already been "outed" as a gay man in Lebanon. Additionally, Karouni has established that, based on his past contacts with other Lebanese homosexuals who have already been apprehended and interrogated by the Hizballah and various Lebanese state actors, he is particularly at risk of being apprehended and persecuted for his homosexuality. Finally, we find compelling the evidence that the prominence of Karouni's family name and Karouni's infection with AIDS would make it extremely difficult for Karouni to avoid his would-be persecutors if returned to Lebanon. For these reasons, we find that Karouni easily satisfies the "ten percent chance of [future] persecution" for establishing a well-founded fear. *Id.*

B. *Withholding of Removal*

**[12]** The IJ assumed that, because Karouni failed to establish that he suffered past persecution or has an independently well-founded fear of future persecution, he could not meet the higher standard to prove that he is entitled to withholding of removal. *See Mansour v. Ashcroft*, 390 F.3d 667, 673 (9th Cir. 2004) ("Because Mansour was unable to meet his burden to demonstrate that he is eligible for asylum he necessarily fails to satisfy the more stringent standard for withholding of removal."). Because we hold that Karouni is statutorily eligible for asylum, we remand to the BIA to determine in the first instance whether Karouni has established eligibility for withholding of removal. *See Ali*, 394 F.3d at 791 (holding that petitioner established statutory eligibility for asylum, but remanding for consideration of petitioner's withholding of removal claim).

> While the grant of asylum is discretionary, withholding of removal is mandatory if the petitioner establishes that upon removal from the United States her "life or freedom would be threatened" on account of one of the five protected grounds. INA § 241(b)(3)(A); 8 U.S.C. § 1231(b)(3)(A). The standard of proof required to establish eligibility for withholding of removal is higher than the standard for establishing eligibility for asylum. *Compare INS v. Stevic*, 467 U.S. 407, 104 S. Ct. 2489, 81 L. Ed. 2d 321 (1984) ("clear probability" standard under former withholding statute) *with INS v. Cardoza-Fonseca*, 480 U.S. 421, 107 S. Ct. 1207, 94 L. Ed. 2d 434 (1987) (asylum standard).

*Id.* Thus, if the BIA finds that Karouni satisfies this higher standard, it must grant him withholding of removal.

## CONCLUSION

For the reasons stated above, we **GRANT** Karouni's Petition for Review, **REVERSE** the IJ's finding that Karouni

does not have a well-founded fear of future persecution, and **REMAND** this case to the BIA. In a manner not inconsistent with this opinion, the Attorney General shall exercise his discretion on Karouni's asylum claim and evaluate Karouni's withholding of removal claim.