NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 19-3733
_____

CRISTIAN JOSE CANTARERO CASTRO,
Petitioner

v.

ATTORNEY GENERAL OF THE
UNITED STATES OF AMERICA
_____

On Petition for Review from a Final Order
of the Board of Immigration Appeals
(Agency No. A215-697-489)
Immigration Judge: Alice Song Hartye
_____

Argued: September 16, 2020
_____


Before: KRAUSE, RESTREPO, and BIBAS, *Circuit Judges*.

(Filed: October 13,2020)

Bridget Cambria [*ARGUED*]
Cambria & Kline
532 Walnut Street
Reading, PA 19601

*Counsel for Petitioner*

Susan B. Green [*ARGUED*]
United States Department of Justice
Office of Immigration Litigation
1100 L Street, N.W.

Washington, DC 20530

William C. Minick
Steven K. Uejio
United States Department of Justice
Office of Immigration Litigation
P.O. Box 878
Ben Franklin Stations
Washington, DC 20044

*Counsel for Respondent*

_____

**OPINION**[*]
_____

RESTREPO, *Circuit Judge*.

We are asked to review the denial of a non-citizen's application for withholding of removal under the Immigration and Nationality Act (INA) and the Convention Against Torture (CAT). Because the Immigration Judge (IJ) erred in significant respects and the Board of Immigration Appeals (BIA) affirmed without explanation, we will vacate and remand for reconsideration.

**I.**

**A.**

Petitioner Cristian Cantarero Castro is a 22-year-old Honduran man who identifies as bisexual and gay. In 2017, at the age of twenty, he was raped at knife point by a man with tattoos, who told him that "he would like it because he is a faggot." Administrative

_____

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

Record (A.R.) 355, 365.  He did not go to the police at that time because he was afraid of being ridiculed for having been raped by a man, or worse, that his assailant would find out and kill him.

He also claims that members of a major gang in Honduras ("Mara 18") repeatedly assaulted and harassed him because of his sexual orientation and political opinion after they discovered that he voted for the National Party (the party in power) rather than the Alliance Party (the gang's preferred political party) in the 2017 presidential election. During these encounters, the gang members called him a traitor and asked him to "unite with them."  A.R. 162.  After he refused, they threatened to kill him.  They added that they "did not like him because he was gay," A.R. 47, that they would make a man out of him by beating him, and that they could kill him because gay people "don't mean anything."  A.R. 104.

Cantarero Castro does not believe Honduran authorities can protect him. Cantarero Castro had witnessed and experienced the harassment and intimidation of gay men by police, including a time when officers pointed their guns at him and his gay friends from a distance, as if they were going to shoot them, and laughed.  And gang members had told him, "[T]he police is with us, and if you go there, it's going to be good for nothing for you."  A.R. 101.  Thus, he went to the police after the encounters with the gang but decided not to report them because he was afraid the gang would find out and kill him.  Instead, he reported the rape from 2017, but the police declined to open an investigation on the grounds that too much time had passed, and nothing could be done.

3

After the gang members targeted Cantarero Castro a second time, he fled

Honduras and entered the United States without authorization. Shortly thereafter, U.S.

authorities detained and removed him to Honduras. Within days of arriving in his

hometown of Santa Cruz, he had another violent encounter with the gang. He decided to

flee again. This time, he stayed with a friend for about a month in San Pedro, a

Honduran city near the Guatemalan border, before traveling to the United States. In San

Pedro, Cantarero Castro did not have problems with the gang only because he

purposefully avoided going into areas they controlled, and though he was personally able

to participate in a "gay march" without incident, A.R. 124, violence against the LGBTI

community often followed these events. He was unable to find work in San Pedro

because he was discriminated against for being gay. He then left for the United States.[1]

**B.**

When Cantarero Castro was detained in the United States the second time, in

January 2019, an asylum officer determined that he expressed a credible fear of returning

to Honduras and referred him to an IJ. Cantarero Castro applied for withholding of

removal under the INA and CAT.

Though the IJ found Cantarero Castro to be "overall credible," A.R. 49, she denied

his application. On the INA claim, the IJ determined that Cantarero Castro had been a

---

[1] The IJ here made the unusual observation that "[t]he applicant says that he did not request asylum in any other country on his travels to the United States." A.R. 49. For purposes of remand, we caution that whatever relevance that circumstance may have for other litigation, *see*, *e.g.*, *East Bay Sanctuary Covenant v. Trump*, 950 F.3d 1242 (9th Cir. 2020), *petition for reh'g filed*, No. 18-17274 (9th Cir. June 29, 2020), it has no bearing on the relocation determination or any other legal issues presented in this case.

4

victim of random criminal conduct and concluded that he failed to show that he had been targeted on account of his membership in a protected social group or his political opinion. Still, the IJ found that he did, indeed, belong to a legally cognizable group, and that the gang members who harmed him were motivated by an intent to "expand their criminal enterprise by having [him] vote for the party they support," A.R. 50. The IJ recognized that rape rises to the level of persecution, but did not address at all whether the other harms, including the gang's assaults and threats, amounted to persecution.

The IJ also concluded that Cantarero Castro failed to show that the Honduran government was unable or unwilling to control his tormentors. The IJ noted that "crime, corruption, and violence are prevalent in Honduras and pose ongoing problems" but found that "the government is taking active steps to combat these issues," citing anti-corruption and anti-crime efforts generally. A.R. 52. The IJ acknowledged the existing "mistreatment and discrimination in Honduras against individuals due to their sexual identity" but found it dispositive that the Honduran government is undertaking efforts to combat violence against the LGBTI community. A.R. 54. She emphasized that, when Cantarero Castro went to authorities, they did not turn him away.

On the CAT claim, the IJ concluded that Cantarero Castro failed to establish that he is likely to be tortured with the consent or acquiescence of the Honduran government. She again noted that the Honduran government "is taking affirmative steps" to deal with crime and corruption. A.R. 55. She repeated that the Honduran police were willing to help Cantarero Castro, but he decided not to cooperate. The IJ also found that Cantarero Castro could live safely in Honduras if he relocated to San Pedro. She noted that, there,

5

he did not suffer any harm and was able to participate in a "gay pride march on one occasion." A.R. 55. The BIA affirmed without issuing an opinion.

Cantarero Castro timely petitioned this Court for review of the BIA's decision.[2]

**II.**

When the BIA affirms without issuing its own opinion, we review the IJ's decision as the final agency decision. *En Hui Huang v. Att'y Gen.*, 620 F.3d 372, 379 (3d Cir. 2010). We review legal conclusions *de novo*, subject to *Chevron* deference when applicable. *Doe v. Att'y Gen.*, 956 F.3d 135, 141 (3d Cir. 2020). We defer to factual findings if supported by substantial evidence "on the record considered as a whole," *Balasubramanrim v. I.N.S.*, 143 F.3d 157, 161 (3d Cir. 1998) (citation omitted), and we may reverse if "any reasonable adjudicator would be compelled to conclude to the contrary." *Doe*, 956 F.3d at 140 (internal quotation marks and citation omitted).

When the IJ finds an applicant credible and the agency denies relief, it must provide reasons for disregarding relevant testimony and corroborative evidence for us to perform a meaningful review of that decision. *Awolesi v. Ashcroft*, 341 F.3d 227, 232-33 (3d Cir. 2003). Although we do not expect the agency "to expressly parse each point or discuss each piece of evidence presented, . . . it may not ignore evidence favorable to the [applicant]." *Fei Yan Zhu v. Att'y Gen.*, 744 F.3d 268, 272 (3d Cir. 2014) (internal quotation marks and citations omitted); *see also Doe*, 956 F.3d at 149 (concluding that substantial evidence was not met when the agency ignored favorable evidence).

---

[2] The BIA had jurisdiction under 8 C.F.R. §§ 1003.1(b), 1208.31(e), and 1240.15. We have jurisdiction under 8 U.S.C. § 1252(a).

6

## III.

Cantarero Castro challenges the agency decision under both the INA and CAT. We address each in turn.

## A.

Under the INA, a non-citizen cannot be removed to another country if it is more likely than not that his "life or freedom would be threatened" on account of one or more protected characteristics including "membership in a particular social group or political opinion." 8 U.S.C. § 1231(b)(3)(A); *Doe*, 956 F.3d at 155. If the applicant shows that he was persecuted in the past, he is entitled to a rebuttable presumption that his life or freedom would be threatened if removed to the country of persecution. *Doe*, 956 F.3d at 150, 155. "[A]s with any claim of persecution, the acts must be committed by the government or forces the government is either unable or unwilling to control." *Sukwanputra v. Gonzales*, 434 F.3d 627, 637 (3d Cir. 2006).

### 1. *Persecution on Account of One or More Protected Characteristics*

Critical to understanding Cantarero Castro's claim is his contention that he is the victim of persecution on account of two protected characteristics: sexual orientation and political opinion. It is undisputed that Cantarero Castro's sexual orientation and sexual identity place him in a particular social group within the meaning of the INA, namely the LGBTI community. *See Doe*, 956 F.3d at 142. Nor is there any question that the threat of persecution may stem from his actual or imputed group membership or political opinion. *Amanfi v. Ashcroft*, 328 F.3d 719, 729-30 (3d Cir. 2003). However, as the Government concedes, the IJ did not adequately analyze the nexus between the

7

mistreatment Cantarero Castro suffered and his protected characteristics. We discern three material missteps.

First, the IJ erred as a matter of law when she stated that persecution cannot be established when persecutors are motivated by criminal intent. Persecutors may have mixed motives for their actions, so long as a protected characteristic is "one central reason," among others, for their harmful conduct. *Gonzalez-Posadas v. Att'y Gen.*, 781 F.3d 677, 684-85, 687 (3d Cir. 2015); *Espinosa-Cortez v. Att'y Gen.*, 607 F.3d 101, 108 (3d Cir. 2010). While the protected characteristic "must be an essential or principal reason for the persecution," *Gonzalez-Posadas*, 781 F.3d at 685 (citing *Ndayshimiye v. Att'y Gen.*, 557 F.3d 124, 130 (3d Cir. 2009)), it does not need to be the "dominant" reason, *i.e.*, it may be "subordinate" to other neutral motives. *Ndayshimiye*, 557 F.3d at 129-30. Thus, even if Cantarero Castro's assailants were motivated by criminal intent, that does not mean that a protected characteristic was not also a central reason for their abuse. The IJ must allow for that possibility.

Second, to the extent that the IJ found that Cantarero Castro's assailants were motivated by criminal intent alone, that determination cannot be sustained under our substantial evidence standard. Ordinarily an applicant's "[t]estimony, by itself, is sufficient to meet this burden, if credible." *Espinosa-Cortez*, 607 F.3d at 108 (alterations in original) (quoting *Singh v. Gonzales,* 406 F.3d 191, 195 (3d Cir. 2005)). Moreover, the nature and context of the harm itself—the chosen method of harm, the locus of the harm, societal stereotypes or stigmas associated with the harm—often provide a window into a persecutor's motives. *See Espinosa-Cortez*, 607 F.3d at 109 ("[C]ircumstantial

8

evidence of motive may include, *inter alia*, the timing of the persecution and signs or emblems left at the site of persecution.") (quoting *Canales-Vargas v. Gonzales,* 441 F.3d 739, 744 (9th Cir. 2006)).

That is especially true in cases involving sexual or sex-based violence. *See*, *e.g.*, *Bringas-Rodriguez v. Sessions*, 850 F.3d 1051, 1073 (9th Cir. 2017) (en banc) (holding that petitioner's sexual orientation was at least "one central reason" for his persecution); *see also Karouni v. Gonzales*, 399 F.3d 1163, 1174 (9th Cir. 2005) ("[W]e agree with Karouni that shooting Khalil in the anus is essentially *res ipsa loquitor* [sic] evidence, or an '[o]bvious sign[ ],' that Khalil was shot because he was a homosexual." (internal citations omitted) (third and fourth alterations in original)); *Mohammed v. Gonzales*, 400 F.3d 785, 798 (9th Cir. 2005) ("[T]here is little question that genital mutilation occurs to a particular individual *because* she is a female," *i.e.*, "being female is a motivating factor—if not a but-for cause—of the persecution.").

Here, the record contains evidence indicating that homophobia is a widespread problem in Honduras and that LGBTI individuals are often targeted specifically with sexual violence among other forms of abuse. In that context, the homophobic harassment and intimidation that Cantarero Castro experienced may be indicative of a graver problem than ordinary criminal conduct and a closer nexus than exists in "[i]solated criminal acts." A.R. 51. If the agency intends to reject or discredit Cantarero Castro's relevant testimony and corroborative evidence, it should have provided "explanation as to why," so that we can meaningfully review that decision. *Fei Yan Zhu*, 744 F.3d at 272; *see also*

9

*En Hui Huang*, 620 F.3d at 388 (remanding when the agency ignored favorable evidence).

Third, the IJ applied the incorrect legal standard when analyzing Cantarero Castro's claim of persecution based on political opinion. The IJ concluded that this claim failed because he had not identified an opinion that he holds, but she failed to consider whether an opinion had been imputed to him as our case law requires. *Lukwago v. Ashcroft*, 329 F.3d 157, 181 (3d Cir. 2003) ("[T]he persecution may be on account of a political opinion the applicant actually holds or on account of one the [tormentor] has imputed to him." (quoting *Balasubramanrim*, 143 F.3d at 164 n.10)). The IJ should have addressed whether the gang's knowledge that Cantarero Castro voted for the incumbent National Party, rather than their preferred political party, was "one central reason" for attacking and threatening him. *Doe*, 956 F.3d at 142; *see Espinosa-Cortez*, 607 F.3d at 111-12 (citing *Delgado v. Mukasey,* 508 F.3d 702, 707 (2d Cir. 2007) (concluding that being pro-government and anti-FARC is a political opinion for asylum purposes)). This analysis must be conducted in a manner that is consistent with the IJ's determination that the gang members targeted Cantarero Castro out of a desire to "expand their criminal enterprise *by having [him] vote for the party they support*." A.R. 50 (emphasis added).

2. *Conduct Rising to the Level of Persecution*

Cantarero Castro's experience in Honduras included multiple incidents of sexual violence, physical assault, death threats, discrimination, and other forms of mistreatment. Although the most severe forms of abuse occurred at the hands of private actors, he also experienced harassment and intimidation by the police.

These incidents should not be viewed in isolation. Rather, the IJ must determine whether, in "the aggregate," the multiple experiences of mistreatment at the hands of private actors and police officers "placed [Cantarero Castro's] life in peril or created an atmosphere of fear so oppressive that it severely curtailed [his] liberty." *Herrera-Reyes v. Att'y Gen.*, 952 F.3d 101, 108 (3d Cir. 2020). Such aggregation demands a finding of persecution, for instance, where verbal threats are made sufficiently concrete and menacing by the "context of violen[ce]" in which they occur. *Id.* at 107.

While the IJ correctly concluded that rape rises to the level of persecution, *see Zubeda v. Ashcroft*, 333 F.3d 463, 472-73 (3d Cir. 2003) (identifying rape and sexual abuse as a form of persecution and torture), *abrogated on other grounds by Auguste v. Ridge*, 395 F.3d 123 (3d Cir. 2005), she failed to address whether the "cumulative effect" and the "overall trajectory" of Cantarero Castro's victimization at the hands of the gang created a situation that was sufficiently menacing or oppressive to rise to the level of persecution. *Herrera-Reyes*, 952 F.3d at 108; *see also Fei Mei Cheng v. Att'y Gen.*, 623 F.3d 175, 193 (3d Cir. 2010) ("[A] series of incidents of physical or economic mistreatment could, taken together, be sufficiently abusive to amount to persecution."). In fact, the IJ makes no findings regarding the level of harm of the gang's numerous death threats and assaults against Cantarero Castro—during which they invoked his sexual orientation and political opinion. The agency must make that calculus on remand.

11

*3. The Honduran Authorities' Ability or Willingness to Control Violence and Abuse Targeting Actual or Perceived Gay Men and Political Opponents of Mara 18*

In concluding that the Honduran government is willing and able to control Cantarero Castro's tormentors, the IJ focused on the government's efforts to combat corruption and crime generally. Yet Cantarero Castro's past harm and fear of future harm does not relate exclusively or primarily to generalized crime. He is attempting to set out a claim of particularized harm based on sexual orientation and political opinion.

While the IJ addressed efforts to combat violence against the LGBTI community in Honduras, she did not engage with evidence indicating that, despite those efforts, the Honduran government is unable to control homophobic abuse by police and private actors. *See Garcia v. Att'y Gen.*, 665 F.3d 496, 503 (3d Cir. 2011) ("[Government] willingness [to protect] sheds no light on [its] *ability* to protect [the applicant].") (emphasis in original). Cantarero Castro testified that he witnessed and experienced the persistent mistreatment directed at LGBTI individuals by society in general, including police intimidation. He averred that this abuse can be so bad that sometimes LGBTI individuals like himself "don't even leave the house" out of fear. A.R. 117. He also submitted evidence corroborating his claim of ongoing widespread violence, harassment, and discrimination against the LGBTI community, not only at the hands of private actors such as gangs, but also government actors, namely the police. There is no indication that the IJ considered the apparent ineffectiveness of the Honduran government's efforts to

12

control this sort of violence. Nor did she provide any reason for disregarding this favorable evidence or for weighing conflicting evidence against him.[3]

Here, Cantarero Castro offered evidence tending to indicate that, as a member of the LGBTI community, he cannot reasonably expect to obtain meaningful protection from police. Or worse, he testified that he could put himself in danger by reporting his abusers and demanding further assistance in the face of uncooperative or hostile police officers. In accordance with the standard we articulated in *Doe*, 956 F.3d at 146-47, Cantarero Castro's decision to forego any further police investigation out of fear of negative repercussions must be viewed in light of this evidence. We cannot be certain that the IJ weighed all of this evidence. And if she did, she must offer reasons for disregarding it.

In concluding our analysis under the INA, we note that Cantarero Castro claims he suffered and fears persecution on two grounds: sexual orientation and political opinion. The IJ must consider how these protected characteristics combine and intersect in Cantarero Castro's specific situation. *See Osorio v. I.N.S.*, 18 F.3d 1017, 1027 (2d Cir. 1994); *see also* UNHCR, Handbook on Procedures and Criteria for Determining Refugee

---

[3] It is unclear whether the IJ believed that the Attorney General's recent decision in *Matter of A-B-* altered the "unwilling or unable" standard. A.R. 66 (citing only *Matter of A-B-*, 27 I. & N. Dec. 316 (2018), for the proposition that an applicant must show that the government "condoned" the conduct, not merely that it had "difficulty in controlling the private behavior"). The IJ did not indicate, however, that Cantarero Castro's claim would succeed pre-*Matter of A-B-* but not after *Matter of A-B-*. In any event, the Government takes the position that *Matter of A-B-* did not raise the relevant standard set forth in our precedent. We anticipate, then, that the agency will faithfully apply that precedent on remand.

13

Status ¶ 67 (2019) ("Usually there will be more than one element combined in one person, *e.g.*, a political opponent who belongs to a religious or national group, or both, and the combination of such reasons in his person may be relevant in evaluating his well-founded fear.").[4]

**B.**

With respect to the CAT claim, under our precedent, the IJ must undertake a double two-pronged analysis. First, the IJ must ascertain factually "what is likely to happen to [the applicant] if removed," and then determine whether what is likely to happen "amount[s] to the legal definition of torture." *Dutton-Myrie v. Att'y Gen.*, 855 F.3d 509, 516 (3d Cir. 2017). Second, the IJ must make factual findings as to "how public officials will likely act in response to the harm the petitioner fears" and then determine "whether the likely response from public officials qualifies as acquiescence under the governing regulations." *Id.*; *see also Quinteros v. Att'y Gen.*, 945 F.3d 772, 786-88 (3d Cir. 2019).

The IJ, here, failed to properly apply this analytical framework. Specifically, she failed to make the requisite factual findings to support her legal conclusion that it was unlikely that Cantarero Castro would be tortured with the consent or acquiescence of Honduran public officials, consistent with *Dutton-Myrie* and our recent decision in *Quinteros*. Furthermore, as suggested in *Quinteros*, the IJ must consider the quality of

---

[4] *See Doe*, 956 F.3d at 154 n.9 (noting that sources like the UNHCR Handbook "provide 'significant guidance' for processing asylum claims in accordance with international standards in the United States.").

14

the Honduran government's efforts to combat the sort of violence that Cantarero Castro fears, 945 F.3d at 788, including its control of lower level officials who may be perpetrating that violence or turning a blind eye to it, for "a government can acquiesce in torture despite opposing the group inflicting the harm," *id.*; *see id.* at 793 & n.31 (McKee, J., concurring) (emphasizing that the conduct of public officials at any level may entail responsibility, even if the highest levels would disapprove); *see also Rodriguez-Molinero v. Lynch*, 808 F.3d 1134, 1139 (7th Cir. 2015) ("The petitioner did not have to show that the entire Mexican government is complicit in the misconduct of individual police officers.").

Even if facts tending to mitigate the likelihood of torture also exist, the IJ must consider favorable evidence offered by Cantarero Castro regarding his specific fears. For instance, Cantarero Castro's participation in one "gay march," A.R. 124, 127, is hardly a clear indication of his ability to live openly and safely in Honduras given that he has testified that being killed is one of the risks associated with participating in these events.[5] That is why he has only participated once in his lifetime. There is also evidence in the record indicating that visible gay rights activists and other human rights defenders are being killed, bolstering Cantarero Castro's claim that gaining visibility as a member of the LGBTI community by participating in a "gay march" puts him in greater (not lesser) danger. *See Doe*, 956 F.3d at 152-53 (noting the increased risks of being publicly

---

[5] We address Cantarero Castro's burden as to relocation in the context of CAT because that is the only portion of the decision in which the IJ made this finding. On remand, the IJ's conclusion as to past persecution will determine which party bears the burden as to relocation in the asylum context. See 8 C.F.R. § 208.16(b)(3).

15

identified as an LGBTI person).  Again, "the agency may not ignore evidence favorable to the [applicant,] . . . [a]nd [i]f [evidence] is to be disregarded, we need to know why." *Quinteros*, 945 F.3d at 786 (internal quotation marks omitted) (third and fourth alteration in original).

## V.  CONCLUSION

For these reasons, we will vacate the agency decision and remand for further proceedings consistent with this opinion.