**Aaron SMITH, Special Administrator of the Estate of James L. Smith, Deceased, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

No. 4:99CV00789 SWW.

United States District Court,
E.D. Arkansas,
Western Division.

Dec. 4, 2000.

Charles R. Karr, Law Office of Charles Karr, Fort Smith, AR, for Aaron Smith, Plaintiff.

Richard M. Pence, Jr., U.S. Attorney's Office, Eastern District of Arkansas, Little Rock, AR, for United States of America, defendant.

## MEMORANDUM AND ORDER

SUSAN WEBBER WRIGHT, Chief Judge.

This is a case brought pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 2671–2680. The plaintiff, Aaron Smith, special administrator of the estate of his deceased son, James L. Smith, alleges wrongful death arising out of surgery performed on his son at the Veterans Administration Medical Center ("VAMC") in Little Rock, Arkansas, on January 13, 1997. The matter was tried to the Court on August 21, 2000. This Memorandum and Order constitutes the Court's Findings of Fact and Conclusions of Law in accordance with Fed.R.Civ.P. 52.[1]

### I.

In 1972, the decedent, James L. Smith, was diagnosed with hypertension for which he began taking medication in 1987. Tr. at 14. In the late 1980's and early 1990's, Smith's hypertension began to adversely affect his job as a truck driver by limiting his ability to pass Department of Transportation physicals. Tr. at 14, 27. Unable to work as a truck driver, Smith went to work as a telemarketer for a company in Ft. Smith, Arkansas. Tr. at 14, 27.

In 1996, Smith began experiencing chest and back pain. Tr. at 14. Smith was examined by Dr. Taylor Prewitt, who determined that Smith had a thoroco-abdominal aortic aneurysm. Tr. at 14. Smith, a Vietnam veteran with no insurance, was subsequently admitted to the VAMC on December 25, 1996, with a diagnosis of a large dissecting aneurysm (approximately 8 centimeters) of the aorta. Compl. at ¶ 9; Tr. at 25, 29, 69–70, 90, 99.[2]

1. Citations to the complaint are in those instances in which there is no dispute.

2. The aorta is the main blood vessel in the body from which all other branches come off. Tr. at 89. It comes off the heart and leads down in through the chest cavity through the abdominal cavity and down into the leg, giving branches to the arms, the kidneys, the viscera, and the guts. Tr. at 89. An aneurysm is an enlargement above the normal size

Smith's doctors at the VAMC were Dr. Tamim Antakli, a cardiothoracic surgeon, and Dr. Mohammed Moursi, a vascular surgeon. Tr. at 15. Dr. Antakli and Dr. Moursi, in consultation with two other doctors at the VAMC, concluded that the risk of surgery was "relatively high," carrying a risk of death of between 15 and 20%, but that surgery was necessary. Tr. at 41–43, 46, 68, 98.

The recommendation for Smith's surgery was made on December 29, 1996. Tr. at 43. During that time, Dr. Antakli and Dr. Moursi considered sending Smith to St. Vincent hospital in Little Rock, Arkansas, and to the Houston VA Medical Center. Tr. at 43–44. In fact, Smith was verbally accepted for admission to the Houston VA Medical Center, which has more experience with these types of operations. Tr. at 44, 131–32. Ultimately, however, the decision was made to perform the surgery at the VAMC.

Although the recommendation for Smith's surgery was made on December 29, 1996, the actual surgery was not performed until January 13, 1997, in part because of the uncommon nature of this surgery and the need to assemble a team to perform the surgery. Tr. at 45–46. In this respect, the type of surgery performed on Smith requires a lot of planning and teamwork. Tr. at 45, 129; Stutzman Depo. at 15–16; Casali Depo. at 34. Dr. Antakli testified that he did one or two of these surgeries a year, while Dr. Moursi testified that approximately one of these surgeries is done at the VAMC per year. Tr. at 76–77, 130. As there was no preassembled team standing by at the VAMC for these types of surgeries, a team had to be assembled for Smith's surgery. Tr. at 45.

Smith was taken to surgery on January 13, 1997. Compl. at ¶ 9. The surgery performed on Smith was vascular surgery in that the vascular surgeon, Dr. Moursi, was the primary surgeon and the surgeon who repaired and replaced the aorta in the chest and abdomen areas. Tr. at 18, 61, 66; Def.'s Tr. Br. at 3. Specifically, Dr. Antakli opened the chest, put Smith on the left heart bypass machine, and prepared the aorta for clamping and resection and for the sewing of the graft. Tr. at 61, 100. Dr. Moursi's role, in turn, was to replace his diseased, aneurysmal, dissected aorta. Tr. at 100.

The course of Smith's surgery, which lasted approximately eight hours, was complicated by episodes of ventricular fibrillation requiring defibrillation as well as resuscitation with bicarbonate. Compl. at ¶ 9; Tr. at 47, 76, 104–105.[3] In addition, the esophagus was "inadvertent[ly]" entered. Tr. at 133. Smith also experienced some bleeding during the procedure. Compl. at ¶ 9; Operative Notes of Dr. Antakli at 6 (Pl.'s Ex. 2); Tr. at 109. Eventually, Smith was closed and transferred to the intensive care unit. Compl. at ¶ 9.

Dr. Antakli dictated an operative report for his portion of the surgery. Operative Notes of Dr. Antakli (Pl.'s Ex. 2). Dr. Moursi did not, however, dictate an operation report on his part of the surgery, even though all hospitals, including VAMC, require that an operative report be dictated. Tr. at 48, 75, 112, 145. Dr. Moursi testified that his failure to dictate an operative note was unintentional. Tr. at 113. He stated that the residents dictate the operative notes, which he then reviews and signs, and that for some unknown reason, an operative note was not dictated for this particular case. Tr. at 112–113, 128. Dr. Moursi, who does some 500 operations per year, stated that this was the only instance

of the artery. Tr. at 89. A "dissecting aneurysm" of the aorta means that the blood going through the aorta actually separates the layers of the aorta; part of the blood flow is going through the wall of the aorta, not just in the inside of the lumen (or channel). Tr. at 70, 90; Stutzman Depo. at 39. A dissecting aneurysm is more likely to rupture than other types of aneurysms. Tr. at 70.

**3.** Ventricular fibrillation is a quivering of the heart such that it is not effectively pumping blood. Tr. at 104; Casali Depo. at 30.

that an operative note has never been dictated on a patient in one of his cases, and that the "system" did not "flag" this case as lacking an operative note because there already was an operative note in the file from Dr. Antakli. Tr. at 112–113, 134.

Following his surgery on January 13th, Smith later that night experienced postoperative bleeding which required that he be returned to the operating room for abdominal exploration and control of bleeding. Compl. at ¶ 9; Tr. at 109. Dr. Moursi operated on Smith and found a bleeding lumbar artery that was oversewn. Tr. at 109. This problem was addressed and Smith was taken back to the intensive care unit. Tr. at 109.

Several days later, Smith was returned to the operating room for removal of pneumothorax. Compl. at ¶ 9. Smith's postoperative course was complicated by paralysis, renal failure, and respiratory failure. Compl. at ¶ 9. In addition, Smith lapsed into a coma from which he never really awakened shortly after the first operation on January 13, 1997, and he required dialysis and ventilation throughout his hospital course. Compl. at ¶ 9. On March 21, 1997, at the age of 49, Smith died of multiple organ failure. Compl. at ¶ 9.

On April 21, 1998, the Department of Veterans Affairs received an administrative claim from Smith's father, plaintiff Aaron Smith, for the alleged wrongful death of James L. Smith. *See* Attachment B (Def.'s Mot. to Dismiss). The claim was submitted on Standard Form 95 ("SF–95"), Claim for Damage, Injury or Death. Attachment B (Def.'s Mot. to Dismiss). Along with SF–95, plaintiff submitted to the agency various VAMC medical records, a death certificate, and documents relating to the probate of the estate of James L. Smith. Attachment B (Def.'s Mot. to Dismiss). In his SF–95, plaintiff stated the following as the basis for the claim: "Death arising out of surgery performed on Decedent on January 13, 1997 to repair a Thoroco–Abdominal Aneurysm. Surgery was performed at the V.A. Hospi-

tal located in Little Rock, Arkansas." Attachment B (Def.'s Mot. to Dismiss).

By letter dated April 22, 1998, the agency requested additional information. *See* Attachment C (Def.'s Mot. to Dismiss). Specifically, the agency requested evidence plaintiff has to support his claim of negligence, the identity of plaintiff's expert, copies of private hospital/clinic and/or physician's records showing the nature and extent of diagnosis and treatment, itemized bills or receipts of payments for medical expenses actually incurred by reason of the alleged incident, itemized bills or receipts of payments for burial expenses actually incurred by reason of the alleged incident causing death, information concerning decedent's survivors (including support), and information concerning decedent's income at the time of his death. Attachment C (Def.'s Mot. to Dismiss). On October 8, 1998, plaintiff responded to the agency's request by supplying additional information. *See* Attachment D (Def.'s Mot. to Dismiss). Thereafter, on April 23, 1999, the Department of Veterans Affairs denied plaintiff's administrative claim, stating that its investigation did not disclose any negligent acts or omissions by employees of the agency acting within the scope of their employment. *See* Attachment E (Def.'s Mot. to Dismiss).

On October 20, 1999, plaintiff filed this lawsuit now before the Court. Plaintiff alleges that the VAMC "violated the standard of care and was negligent in that in diagnosing the condition of, treating of, operating upon, or obtaining the informed consent of the Decedent, it failed to possess and apply with reasonable care the degree of skill and learning ordinarily possessed and used by members of its profession . . . ." Compl. at ¶ 10. He additionally alleges that defendant "failed to use ordinary care to determine the physical condition of the Decedent and to furnish the Decedent the care and attention reasonably required by his physical condition," and that "Defendant's violation of the standard of care and negligence proximately

caused the Decedent's death." Compl. at ¶¶ 11–12. Plaintiff claims that as special administrator of the estate of his son, he is entitled to recover the sum of $1,500,000.00 from defendant for the following seven elements of damage: (1) pecuniary injuries sustained by plaintiff; (2) mental anguish suffered and reasonably probable to be suffered in the future by plaintiff; (3) the reasonable value of funeral expenses; (4) conscious pain and suffering of the Decedent prior to his death; (5) medical expenses attributable to the fatal injury; (6) the value of any working time lost by the Decedent prior to his death; and (7) scars, disfigurement, and visible results of the injury sustained by the Decedent prior to his death. Compl. at ¶ 13.

On July 7, 2000, the defendant, United States of America, filed a motion to partially dismiss plaintiff's complaint for lack of subject matter jurisdiction pursuant to Fed.R.Civ.P. 12(b)(1). By Memorandum and Order entered August 3, 2000, this Court granted defendant's motion, finding that plaintiff's claim of negligence in the performance of surgery on James L. Smith on January 13, 1997, was the only claim of negligence presented to the agency in plaintiff's administrative claim and, therefore, all other claims of medical negligence, including claims regarding diagnosis and lack of informed consent, were barred for lack of subject matter jurisdiction. *See* Memorandum and Order at 7–8. Thus, plaintiff's claim regarding the excessive mortality rate for the cardiac unit at the VAMC as being relevant to the issue of informed consent was deemed by this Court to be beyond the parameters of this lawsuit.[4] The Court did find, however, that plaintiff's claims to recover for the estate of James L. Smith were not barred by lack of subject matter jurisdiction and would be considered. *See* Memorandum and Order at 9.

Accordingly, as plaintiff's claim of negligence in the performance of surgery on

James L. Smith on January 13, 1997, is the only claim of negligence that is properly before this Court, it is that issue to which the Court now turns.

## II.

### A.

The FTCA represents the federal government's waiver of sovereign immunity as to claims for damages for injuries caused by the torts of government employees acting within the scope of their employment "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." *Brown v. United States,* 151 F.3d 800, 803 (8th Cir.1998) (quoting 28 U.S.C. § 1346(b)). The "law of the place" refers to the substantive law of the state where the wrongful conduct took place. *Washington v. Drug Enforcement Administration,* 183 F.3d 868, 873 (8th Cir.1999) (citing *FDIC v. Meyer,* 510 U.S. 471, 477–78, 114 S.Ct. 996, 127 L.Ed.2d 308 (1994)). Thus, Arkansas law applies to this case.

### B.

In Arkansas, the standard of care and burden of proof in a medical malpractice case is defined by statute as follows:

(a) In any action for medical injury, the plaintiff shall have the burden of proving:

(1) The degree of skill and learning ordinarily possessed and used by members of the profession of the medical care provider in good standing, engaged in the same type of practice or specialty in the locality in which he practices or in a similar locality;

(2) That the medical care provider failed to act in accordance with that standard; and

---

4. In addition, the Court has considered and rejects any notion that evidence concerning the excessive mortality rate for the cardiac unit at the VAMC necessarily indicates that there was negligence in the performance of Smith's surgery on January 13, 1997.

(3) That as a proximate result thereof, the injured person suffered injuries which would not otherwise have occurred.

Ark.Code Ann. § 16–114–206. *See also Skaggs v. Johnson,* 323 Ark. 320, 915 S.W.2d 253, 255 (1996).

**1.**

 There is no real dispute in this case concerning the degree of skill and learning ordinarily possessed and used by members of the profession of Drs. Antakli and Moursi in good standing, engaged in the same type of practice or specialty in the locality in which they practice or in a similar locality. In this regard, and leaving aside the seemingly haphazard manner in which a team had to be assembled for Smith's surgery, the Court will accept for purposes of today's decision that the methods and techniques contemplated for plaintiff's surgery (as opposed to actually utilized) met the standard of medical care. *See* Casali Depo. at 24–25. Rather, the essential dispute concerns whether Drs. Antakli and Moursi failed to act in accordance with the standard of medical care as accepted for purposes of today's decision, and whether, as a proximate result thereof, Smith suffered injuries which would not otherwise have occurred. Although ordinarily it is plaintiff's burden to establish facts leading to liability, the Court in this case finds that Dr. Moursi, the primary surgeon, failed to follow the appropriate standard of care when he failed to dictate operative notes of the surgical procedure he performed and, thus, the Court infers that Dr. Moursi failed to act in accordance with the degree of skill and learning ordinarily possessed and used by members of his profession engaged in the same type of practice or specialty in the locality in which he practices, and that as a proximate result thereof, Smith suffered injuries resulting in his death which would not otherwise have occurred.

**a.**

 That an adverse inference may arise from the fact of missing evidence is a generally accepted principle of law, *see Welsh v. United States,* 844 F.2d 1239, 1246 (6th Cir.1988), and finds support in Arkansas case law. *Cf. Goff v. Harold Ives Trucking Co., Inc.,* 342 Ark. 143, 27 S.W.3d 387 (2000) (in case of first impression, the Arkansas Supreme Court declined to recognize spoilation of evidence as an independent tort, but concluded that a fact-finder may infer from the destruction of evidence that whatever was contained in that evidence was unfavorable to the party that destroyed it); *Carr v. St. Paul Fire & Marine Ins. Co.,* 384 F.Supp. 821 (W.D.Ark.1974) (case in which the district court for the Western District of Arkansas concluded that where a hospital's employees had destroyed the decedent's medical record for an unknown reason, the jury could properly infer that the record, had it been retained, would have shown that the hospital employees were negligent).

The decision in *Carr* is instructive and bears examination. *Carr* involved alleged negligence on the part of a hospital and its employees in the treatment and failure to treat the decedent, who had been received in the emergency room suffering from severe abdominal pains. The evidence indicated that after the arrival of the decedent at the hospital, the vital signs of the decedent were taken by one of the orderlies who conveyed the information to the other orderly to put in the record. The nurse in charge of the emergency room conferred with the orderlies and, in accordance with the request of the deceased, attempted without success to reach his regular physician. The plaintiff testified that she and the decedent then demanded that any available doctor be called, but that the nurse failed to call anyone after having been unable to communicate with the decedent's regular physician. At the time the nurse was aware that the decedent was suffering from severe abdominal pains, that he had vomited prior to entering the hospital, and that he was in need of relief. In any case, after the decedent returned home, the pains grew worse, and he again summoned an ambulance to return him to

the hospital where, at some point unclear from the record, he died. The emergency room personnel testified that the decedent's vital signs were normal, but they also testified that the record of the examination of the vital signs was destroyed that night and was not seen by anyone other than the two orderlies, the nurse, and possibly the coroner. In concluding that the jury could properly infer that the record, had it been retained, would have shown that the hospital employees were negligent, the Court stated as follows:

> The Court does not know why the record was destroyed, but does know that the plaintiff was greatly hampered in proving just what was done by the employees and what their examination disclosed, and the jury had a right to consider the effect that such destruction had in determining the actual facts. It seems highly unreasonable that the findings of the physical condition of a person examined by the emergency room employees would be destroyed. No one knows the effect that such action had on the jury, but the jury certainly had a right to infer that the record had it been retained would have shown that a medical emergency existed and that a doctor should have been called and that more attention should have been given him than was given.

*Carr*, 384 F.Supp. at 831.

■ Although the case at bar differs from *Carr* and *Goff* in that it apparently does not involve the destruction of pre-existing evidence,[5] the principle of law to be gleaned from these cases is the same: an adverse inference may be drawn from the failure of a party to produce certain evidence—in this case an operative note—where that evidence is within the control of the party in whose interest it would naturally be to produce it and, without satisfac-

tory explanation, he fails to do so. *Cf. Welsh*, 844 F.2d at 1247 (stating that where one party wrongfully denies another the evidence necessary to establish a fact in dispute, the court should draw the strongest allowable inferences in favor of the aggrieved party).

b.

Certainly, there is no dispute that an operative note should have been dictated by Dr. Moursi. As previously noted, all hospitals, including VAMC, require that an operative report be dictated. Indeed, public policy requires that adequate operative notes be kept, *see Public Health Trust of Dade County v. Valcin*, 507 So.2d 596, 601 (Fla.1987), and the fact that no such notes are taken, especially following a surgery of this magnitude, may be considered suspicious. *See id.* at 599 ("Rarely, and usually only in malpractice cases, the findings [in a surgical note] are inadequately described or omitted altogether. This is a suspicious circumstance.") (quoting J. McQuade, Medical Practice for Trial Lawyers § 2–20 (2d ed.1985)). *See also Cruz v. United States*, 1998 WL 13839, at *5 n. 9 (S.D.N.Y.1998) (noting that "[i]t is standard procedure for the surgeon to dictate an operative report following the surgery, which sets forth the procedure, the indications for the procedure, and what transpired during the surgery," and any suggestion that such a report "should not be taken by the courts seriously is not persuasive—indeed untenable and shocking").

As in *Carr*, this Court does not know for certain why an operative note was not dictated by Dr. Moursi. Regardless, having observed Dr. Moursi at trial and having reviewed the record, the Court finds that Dr. Moursi's explanation for his failure to dictate an operative note is suspicious and, at least, unsatisfactory,[6] and

---

5. The Court makes no such findings, however.

6. As previously noted, Dr. Moursi merely testified that his failure to dictate an operative note was unintentional. He stated that the residents dictate the operative notes, which he then reviews and signs, and that for some unknown reason, an operative note was not

dictated for this particular case. Although Dr. Moursi does some 500 operations per year, he stated that this was the only instance that an operative note has never been dictated on a patient in one of his cases, and that the "system" did not "flag" this case as lacking

that an adverse inference from this failure should therefore be drawn in favor of the plaintiff. *Cf. Clark v. Philadelphia College of Osteopathic Medicine,* 693 A.2d 202, 204 (1997) (jury was properly instructed that it could draw adverse inference from absence of doctor's office notes where doctor accounted for their absence by claiming that he did not take notes but only "scribbled 'notations'" and that his office files had been "thinned").

c.

▮ There remains the question of the strength of the inference that is to be drawn from Dr. Moursi's failure to dictate an operative note. *See Welsh,* 844 F.2d at 1247 (noting that "[t]he strength of the inference allowable obviously will vary according to the facts and evidentiary posture of a given case"). Given the facts of this case, the Court will draw the strongest possible adverse inference and thereby conclude that plaintiff has met his burden of proof in establishing his claim of negligence in the performance of surgery on Smith on January 13, 1997.

Dr. Moursi opined that Smith did not recover from his surgery because of the ventricular fibrillation. Tr. at 127. He testified that there was no "inadvertent" episode "whatsoever" during his part of the surgery, and that even though he performs some 500 operations per year, he "remember[ed] this operation very, very carefully." Tr. at 133–34. However, Dr. Moursi could only state that his "recollection" and belief is that Smith had more than one episode of ventricular fibrillation, and he stated that his "conjecture" as to the cause of the ventricular fibrillation was that it must have been caused by the unclamping or reestablishment of blood flow to the guts given the temporal relation of that event to the episode of ventricular fibrillation. Tr. at 105, 107–08. Although defendant's expert, Dr. Robert Casali, likewise testified that ventricular fibrillation likely "was the main problem

that was the big factor in [Smith's] demise," he was less certain than Dr. Moursi as to what caused Smith's ventricular fibrillation, stating that he had no "strong opinion" on the matter. Casali Depo. at 30, 38.

Aside from the fact Dr. Moursi's recollection cannot be said to be unequivocal and that his conjecture concerning the fibrillation being caused by the reestablishment of blood flow and not by some "inadvertent" episode is, as confirmed by defendant's expert, just that—conjecture—, the fact remains that Dr. Moursi's failure to dictate an operative note has, in the words of *Carr,* "greatly hampered [plaintiff] in proving just what was done" by Dr. Moursi during the course of the operation and, thus, denied plaintiff essential evidence necessary to establish his case. Plaintiff's expert, Dr. Stutzman, stated in his deposition that he was unable to evaluate Dr. Moursi's portion of the operation due to the failure to dictate an operative note, *see* Stutzman Depo. at 21, and this Court similarly is unable to evaluate in a meaningful manner Dr. Moursi's actions during the operation.[7] Indeed, Dr. Stutzman stated that the failure to dictate an operative note in this case was "a gross oversight [that was] certainly below the standard of care," that all procedures of any magnitude should be dictated, and that he couldn't agree with Dr. Moursi that the failure to do so in this case was a simple matter of oversight. Stutzman Depo. at 21. This Court agrees in all respects, *see Cruz,* 1998 WL 13839; *Public Health Trust of Dade County,* 507 So.2d 596; *Clark,* 693 A.2d 202, and concludes that the failure to dictate an operative note following a surgery of this magnitude in accordance with the standards of ordinary medical practice has deprived plaintiff of essential evidence necessary for the presentation of his case. That being so, and as this Court finds Dr. Moursi's explanation to

---

an operative note because there already was an operative note in the file from Dr. Antakli.

7. Dr. Antakali's testimony at trial sheds little light on what happened during Dr. Moursi's portion of the operation.

be suspicious and in any case unsatisfactory, the Court will infer that such operative notes would have established that Dr. Moursi failed to act in accordance with the degree of skill and learning ordinarily possessed and used by members of his profession engaged in the same type of practice or specialty in the locality in which he practices, and that as a proximate result thereof, Smith suffered injuries resulting in his death which would not otherwise have occurred.

2.

The Court now turns to the question of damages. Plaintiff seeks damages in the amount of $1,500,000 for the death of his son, with whom he lived. There is in the record evidence concerning mental anguish suffered and reasonably probable to be suffered in the future by plaintiff (including loss of sleep and depression), monthly income provided by Smith to plaintiff (including the payment of utilities and taxes, and the purchase of groceries), plaintiff's funeral expenses, and other elements of damage. Having carefully considered the matter, the Court finds that plaintiff has proven he suffered damages from the death of his son in the amount of $200,000.00, and that the estate is entitled to damages in the amount of $5,000.00 for funeral expenses.

### III.

For the foregoing reasons, the Court infers that Dr. Moursi failed to act in accordance with the degree of skill and learning ordinarily possessed and used by members of his profession engaged in the same type of practice or specialty in the locality in which he practices, and that as a proximate result thereof, Smith suffered injuries resulting in his death which would not otherwise have occurred. Plaintiff is entitled to total damages in the amount of $205,000.00. Judgment will be entered accordingly.