# In the
# United States Court of Appeals
## For the Seventh Circuit
_____

No. 04-2157

ISMAILA SOUMAHORO,

*Petitioner*,

v.

ALBERTO R. GONZALES,

*Respondent.*

_____

On Petition for Review of an Order of
the Board of Immigration Appeals.
No. A 79 287 087

_____

ARGUED JUNE 1, 2005—DECIDED JULY 19, 2005

_____

Before MANION, WOOD, and SYKES, *Circuit Judges.*

PER CURIAM.  Ismaila Soumahoro fled Cote d'Ivoire (or Ivory Coast) and sought asylum in the United States, claiming that he was and will be persecuted as a leading member of a political party opposed to the governing regime. An immigration judge (IJ) denied his applications for asylum, withholding of removal, and relief under the Convention Against Torture because he found that Soumahoro did not corroborate his testimony and did not establish that he suffered past persecution. The Board of

Immigration Appeals (BIA) summarily affirmed, and Soumahoro petitioned this court for review. We now grant his petition.

## I.

Soumahoro is a Muslim and member of the Jula ethnic group. He testified that he joined the opposition political party Rassemblement Des Républicains (RDR) in 1996 and a year later became the party's secretary general for a sizeable part of Cote d'Ivoire's largest city. Soumahoro focused his efforts with the RDR on recruiting younger voters to the party. His political activities caused no problems for him until 1999, when the government was overthrown in a military coup led by General Robert Guei. Soumahoro testified that in April 2000 police officers came to the school where he had taught for nineteen years and arrested him. He and approximately twenty other RDR supporters were detained for two weeks, beaten daily, and given only minimal food and water. Guards also rubbed salt in his wounds to increase his suffering. During his detention, the officers repeatedly urged him to denounce the RDR and sign a statement declaring RDR leader Alassane Ouattara an enemy of the country, but Soumahoro refused to do so.

After Soumahoro was released, he spent three days under a doctor's care before returning to his job. But when he returned to the school, the director fired him because of his extended absence. Soumahoro claims that his firing was part of a larger campaign by Guei to remove Muslims and Jula from public employment. After he was fired, Soumahoro began working full-time at the local RDR headquarters. During the next five months he testified that police occasionally came looking for him but that he was not arrested or physically harmed during this time.

Tensions between the Guei junta and the RDR escalated sharply in late October 2000 in the aftermath of what the State Department country report describes as a "flawed presidential election" that was "marred by significant violence and irregularities." Before the election, police forcibly quashed campaign rallies by the RDR and other opposition parties, while permitting campaigning only by supporters of General Guei. Guei's allies on the country's supreme court then disqualified Ouattara and most other opposition candidates. The RDR called for a boycott of the election and voter turnout was extremely low. After exit polls showed that Laurent Gbagbo—a candidate from the Front Populaire Ivoirien party—was the likely winner, soldiers loyal to Guei stormed the headquarters of the election commission and halted the vote count. Soldiers also took control of the national radio and television stations and declared Guei the winner. This announcement triggered violent protests by Gbagbo supporters, and Guei was eventually forced to concede the election and flee for his life. The installation of Gbagbo as president touched off a new round of protests by RDR supporters, who demanded a new election in which their candidate would be allowed to participate. Soldiers loyal to Gbagbo violently suppressed the RDR demonstrations, killing over 500 protesters and injuring hundreds more. Soumahoro testified that he took part in the protests against Gbagbo's presidency and that one of his assistants at the RDR was killed when police opened fire on a group of demonstrators.

The violence following the October election led Soumahoro to make plans to flee the country. He moved from place to place for several weeks to evade the authorities, and in December 2000 obtained a false passport which he used to enter the United States. Soumahoro left his mother, wife, and two children behind. Although he did not explain why he left his family behind, he believes they fled

to either Burkino Faso or Mali. Other members of Soumahoro's family remain in Cote d'Ivoire, and his uncle and brother-in-law are in prison because of their involvement with the RDR.

After Soumahoro's departure, the political crisis in Cote d'Ivoire worsened. Civil war erupted after a failed coup in September 2002, and hostilities flare up regularly despite the presence of thousands of international peace-keepers. The Country Report used at the hearing in March 2003 was dated March 4, 2002, and thus does not include the September coup. Soumahoro's attorney objected to the use of such an outdated report and noted that a new report was due to be issued within a month, but the IJ overruled his objection.

Soumahoro attempted to obtain supporting documentation from a friend in Cote d'Ivoire, but for a number of reasons the documents did not arrive by the time of the hearing. Soumahoro filed a motion for a continuance a week before the hearing, asserting that the renewed hostilities in Cote d'Ivoire prevented his friend from mailing the documents. The day after Soumahoro requested the continuance, his friend was able to ship the documents, and he faxed Soumahoro a copy of an airbill from the courier company DHL that was dated February 26, 2003. But there were multiple mistakes on the airbill that further delayed the shipment. For instance, the airbill was addressed to Soumahoro's home in Greensboro, North Carolina, but North Carolina was incorrectly abbreviated "NG" and the address contained the wrong zip code. According to the Postal Service website, the zip code on the airbill (22407) is for Fredericksburg, Virginia, and is one digit off of the correct zip code for Soumahoro's apartment in Greensboro (27407). At the hearing Soumahoro presented the airbill and again requested a continuance. The IJ, however, spe-culated

that Soumahoro had arranged to have an empty box sent to him in order to delay the proceedings and held the hearing as scheduled. The package arrived two days after the hearing, and counsel tells us that it contained Soumahoro's birth certificate, his national identification card, two letters from RDR officials attesting to his involvement with the party, and several local newspaper articles describing current conditions in the country.

The IJ denied Soumahoro's application for several reasons, but the focus of his decision was on the lack of corroborating evidence. In the alternative, the IJ also found that Soumahoro did not suffer harm severe enough to constitute past persecution. The IJ also repeatedly expressed doubt about key elements of Soumahoro's testimony, but he never made a credibility finding. The BIA summarily affirmed the IJ's decision under its streamlining approach.

## II.

When the BIA affirms an IJ's ruling without opinion, we review the IJ's decision as if it were that of the BIA. *Lin v. Ashcroft*, 385 F.3d 748, 751 (7th Cir. 2004). We must uphold the IJ's decision provided that it is supported by reasonable, substantial, and probative evidence. *Id.* But although our review is deferential, "we will not automatically yield to the IJ's conclusions when they are drawn from insufficient or incomplete evidence." *Georgis v. Ashcroft*, 328 F.3d 962, 968 (7th Cir. 2003).

Soumahoro first argues that the IJ's decision to deny his application for lack of corroboration was not supported by substantial evidence because the IJ never made a credibility finding and failed to address his contention that his supporting documents were in transit with DHL. The IJ listed several types of documents he said Soumahoro should have

provided, including: a plane ticket showing his date and place of entry into the United States; documents establishing his ethnicity, religion, employment, and membership in the RDR; medical reports of treatment for his injuries; and documentation of his family's current whereabouts. When an IJ denies an asylum application for lack of corroborating evidence, he must (1) make an explicit credibility finding; (2) explain why additional corroboration is reasonable; and (3) explain why the alien's explanation for not producing the requested corroboration is inadequate. *Gontcharova v. Ashcroft*, 384 F.3d 873, 877 (7th Cir. 2004).

The IJ here failed to make a credibility finding, as required by *Gontcharova*, and we have repeatedly observed that the lack of such a finding makes our review difficult. *See Iao v. Gonzales*, 400 F.3d 530, 534 (7th Cir. 2005); *Diallo v. Ashcroft*, 381 F.3d 687, 698-99 (7th Cir. 2004); *Niam v. Ashcroft*, 354 F.3d 652, 658 (7th Cir. 2004) (lack of credibility finding left "yawning void" in IJ's decision). The IJ commented in his decision that he disbelieved Soumahoro's testimony, but we have emphasized that passing expressions of disbelief do not adequately substitute for an adverse credibility finding. *See Iao*, 400 F.3d at 534; *Diallo*, 381 F.3d at 698. An adverse credibility finding must be supported by "specific, cogent reasons" that bear "a legitimate nexus" to the finding. *Capric v. Ashcroft*, 355 F.3d 1075, 1086 (7th Cir. 2004). The IJ here simply expressed doubt about Soumahoro's claims without ever giving specific reasons why he disbelieved his testimony.

Much of the IJ's skepticism seems to have been motivated by Soumahoro's failure to corroborate his claim with documentary evidence. An IJ must explain why additional corroboration is reasonable and why the applicant's explanation for not providing it is inadequate. *Gontcharova*, 384 F.3d at 877. Soumahoro does not dispute that at least some

of the IJ's demands for documentation are reasonable. But he argues that the IJ did not adequately consider his explanation for not providing supporting documentation. The IJ faulted Soumahoro for not requesting documents from Cote d'Ivoire immediately upon arriving in the United States. But Soumahoro testified that he was unable to retain an attorney until March 2002 and that it was another six months before his attorney told him the specific documents he would need. Within a week of receiving the list of documents his attorney wanted, Soumahoro phoned a friend in Cote d'Ivoire to request assistance in obtaining them. But unfortunately for Soumahoro, his call to his friend in September 2002 came only days before the outbreak of civil war in his home country. Furthermore, his friend's efforts were delayed because Soumahoro's wife had many of the original documents and neither Soumahoro nor his friend knew her whereabouts.

We agree that the IJ did not adequately consider Soumahoro's explanation for the missing documents. The IJ completely disregarded Soumahoro's explanation that the corroborating documents were contained in the DHL package. Soumahoro explained that his friend's efforts to locate the documents were hampered by the outbreak of war, and he presented an airbill showing that a package with an obviously incorrect address had been mailed to him from Cote d'Ivoire. The IJ never said why he found this explanation inadequate, and Soumahoro's explanation is far more plausible than the IJ's alternative unfounded conclusion that Soumahoro had arranged to have an empty box sent to himself. The IJ also faulted Soumahoro for not asking his friend to collect documents earlier. Although Soumahoro perhaps could have acted more quickly, it was unreasonable for the IJ to assume that he was sufficiently familiar with procedures in the immigration court to realize the specific documents he needed before even obtaining counsel. The

documents that he believed were contained in the package—including Soumahoro's birth certificate and national identity card and two letters from RDR officials attesting to his involvement in the party—are precisely the types of documents the IJ faulted him for not providing at the hearing. Under these circumstances, it was unreasonable for the IJ to reject Soumahoro's explanation for why the documents had not yet arrived by the time of the hearing.

Soumahoro next contests the IJ's finding that he did not suffer harm severe enough to qualify as past persecution. Persecution is "punishment or the infliction of harm for political, religious, or other reasons that this country does not recognize as legitimate." *Liu v. Ashcroft*, 380 F.3d 307, 312 (7th Cir. 2004) (internal quotation and citation omitted). It is not necessary that an asylum applicant's life or freedom were threatened, but the harm he suffered must rise above the level of "mere harassment" and must result from more than unpleasant or even dangerous conditions in his home country. *Id.* (internal citations and quotation omitted). The IJ found that Soumahoro's two-week detention "in and of itself" did not rise to the level of past persecution. The IJ also concluded that Soumahoro was not persecuted because "the obvious reason is that the respondent could not find employment in Ivory Coast and sought to leave to better his life."

We agree with Soumahoro that the IJ erred by finding that the events he described did not rise to the level of past persecution. We have recognized that actions such as "detention, arrest, interrogation, prosecution, imprisonment, illegal searches, confiscation of property, surveillance, beatings, or torture" may be sufficient to establish persecution. *Ciorba v. Ashcroft*, 323 F.3d 539, 545 (7th Cir. 2003) (internal citation and quotation omitted). Soumahoro testified that he endured several of these actions. He testified that he was

arrested and imprisoned for two weeks, during which time he was beaten regularly, denied adequate food and water, and had salt literally rubbed in his wounds. He also testified that he was fired from the job he had held for nineteen years as part of a campaign by government officials to eliminate Muslims, Jula, and RDR supporters from public employment. Although he was ostensibly fired for missing work, his testimony makes clear that he believes his termination was related to his arrest and political activity, and we reiterate that the IJ did not find him incredible. In the seven months between when he was released from prison and when he fled the country, Soumahoro explained that he participated in political demonstrations that were violently suppressed and added that one of his subordinates in the RDR was killed during a demonstration. The IJ never explained why he believed these events were not sufficiently serious to constitute past persecution. Instead, the IJ disregarded this testimony and found that the "obvious" reason Soumahoro fled Cote d'Ivoire was because he could not find work—a conclusion totally unsupported by the record.

We addressed a factually similar claim in *Asani v. INS*, 154 F.3d 719, 722-23 (7th Cir. 1998), in which we held that an applicant suffered persecution when he was jailed for two weeks in a tiny cell, denied adequate food and water, and lost two teeth as a result of police beatings. In contrast, in *Dandan v. Ashcroft*, 339 F.3d 567, 574 (7th Cir. 2003), we held that we were not compelled to find that an applicant was persecuted when he was detained for three days with minimal food and beaten until his face was swollen. Soumahoro's case is closer to *Asani* than to *Dandan*. Soumahoro was detained for two weeks—the same amount of time as the applicant in *Asani*—and testified that he was beaten daily and sustained injuries serious enough to

require three days of medical care. Furthermore, after his release, Soumahoro continued to play a leadership role in the RDR and testified that he participated in political rallies that were forcibly suppressed by government forces. On these facts, we cannot say that the IJ's finding that Soumahoro did not suffer serious enough harm to establish past persecution is supported by substantial evidence.

### III.

Soumahoro's petition for review is GRANTED and the order of removal is VACATED. Because Soumahoro is entitled to a new hearing on his asylum claim, we need not address his alternative arguments concerning his applications for withholding of removal and relief under the Convention Against Torture.

A true Copy:

      Teste:

                         _____
                         *Clerk of the United States Court of*
                              *Appeals for the Seventh Circuit*