**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

BALWINDER SINGH,

                *Petitioner,*

v.

ALBERTO GONZALES, United States
Attorney General,*

                *Respondent.*

No. 03-74390

Agency No.
A72 116 384

OPINION

On Petition for Review of an Order
of the Board of Immigration Appeals

Argued and Submitted
September 14, 2006—San Francisco, California

Filed June 12, 2007

Before: William A. Fletcher and Johnnie B. Rawlinson,
Circuit Judges, and Thelton E. Henderson,** District Judge.

Opinion by Judge Henderson;
Dissent by Judge Rawlinson

---

*Alberto Gonzales is substituted for his predecessor, John Ashcroft, as Attorney General for the United States, pursuant to Fed. R. App. P. 43(c)(2).

**The Honorable Thelton E. Henderson, Senior United States District Judge for the Northern District of California, sitting by designation.

**COUNSEL**

Inna Lipkin, Redwood City, California, for the petitioner.

Allen W. Hausman, & Blair T. O'Connor, United States Department of Justice, Washington, D.C., for the respondent.

## OPINION

HENDERSON, District Judge:

Balwinder Singh, a Sikh citizen of India, petitions for review of a final order of deportation issued by the Board of Immigration Appeals ("BIA"), denying his applications for asylum and withholding of removal under the Immigration and Nationality Act sections 208 and 241(b)(3), 8 U.S.C. §§ 1158, 1231(b)(3). The immigration judge ("IJ") failed either to make an express credibility finding, or to analyze whether Singh's testimony and other evidence demonstrated he suffered past persecution and had a well-founded fear of future persecution on the basis of a political opinion imputed to him. Instead, the IJ drew an adverse inference from Singh's refusal to allow access to a Canadian immigration file under his name, and denied his applications on that basis. He erred in doing so. We hold that the inference alone is insufficient to support a denial of asylum. We remand, either for the IJ to make an explicit credibility determination, or for the IJ or the Board to accept Singh's testimony as true and determine whether he has met his burden of proving statutory eligibility for asylum.

## Background

Petitioner Balwinder Singh (Singh) is a Sikh citizen of India. He entered the United States through Canada in 1993, and filed an application for asylum and withholding of removal shortly thereafter. In 1999, Singh was served with a Notice to Appear informing him he was subject to removal. Singh concedes he is removable.

Singh contends that he was persecuted in India because of his membership activities in the All India Sikh Student Federation (AISSF), which, among other things, advocates creation of an independent Sikh homeland called Khalistan. At his first asylum hearing, Singh testified that he joined the AISSF in

January of 1989. As a member, he participated in demonstrations, distributed political materials, and supported political candidates who called for the creation of a separate Sikh country. He testified to four incidents of persecution which he attributed to his AISSF membership.[1]

First, in June of 1989, Singh was arrested after he held a meeting at his farmhouse with other AISSF members. The police held him and the others at the police station for two days. They accused Singh of being "Khalistani" and of aiding militant separatists. He was beaten with batons, hit with straps, and had his legs pulled apart.

Singh was arrested again in October of 1989 after he participated in a rally organized by the AISSF. Police again called him "Khalistani." They beat him with batons and a chair, kicked him, hung him upside down from the ceiling, and forced him to stand on one leg. Police also tried to force him to implicate other AISSF members in crimes. He was held in police custody for 5 days, and released only with the help of members of his village.

The third arrest took place after a rally in April of 1991. Police accused Singh of being a "Khalistani" and of turning the populace against the government. They held him for seventeen days, again beating and torturing him. Singh was treated at a medical clinic for four or five days after his release.

Finally, in March of 1992, Singh was arrested a fourth time because he was wearing a saffron-colored turban (the color of the Khalistani flag) and an AISSF badge. After this arrest, he decided to leave India.

---

[1]He also testified that he was beaten by young Hindu men who called him "Khalistani" while he was waiting at a bus stop even before he became an AISSF member.

Singh testified that an AISSF agent, who was also an Indian government official, helped him enter the United States. The agent gave him a passport in the name of Sohan Lalf, which he used to leave India. He entered Canada on March 25, 1993. He was detained at the airport, where he was fingerprinted and signed documents. He testified that he was released from detention several days later after the AISSF agent paid his bond, and he crossed the border into the United States on foot several days after that.

At the conclusion of the hearing, the government requested an opportunity to check with Canadian immigration to verify Singh's story about his entry into Canada. The IJ noted that Singh had submitted no documents in support of his asylum application confirming his identity, and that corroborating evidence from Canadian immigration records might support his claim. The IJ granted the continuance.

At the next hearing, the government explained that it had contacted the Canadian refugee immigration board, and that the board had both a file and pending asylum application for a "Balwinder Singh" with the same birth date as the Petitioner here. Singh clarified that he had in fact entered Canada on his own passport; the AISSF agent had taken the Sohan Lalf passport from him during the journey from India, and given him his real passport to use to enter Canada. Asked whether he had filed for asylum in Canada, Singh testified through a translator that "I don't know about it. I don't know what they did" — only that officials at the Canadian airport made him sign papers and took his fingerprints.

The government reported it was unable to obtain the Canadian Balwinder Singh file, however. The Canadian agency refused to disclose the file without a waiver of confidentiality, and Singh had refused to sign the waiver.

At the hearing, Singh explained he refused to sign because he was afraid the AISSF agent who had helped him reach the

United States would harm his family if he signed the waiver. "The agent who brought me here . . . told me, if I sign any paper or if I know [sic] anyone else about him, he threatened that he can get my family killed back home." Moreover, Singh testified that in 2000, almost seven years after he arrived in the United States, he received a telephone call from someone who identified himself as a Canadian immigration official. This person knew the name of the AISSF agent, and asked if Singh knew his whereabouts. Singh said he did not. Singh explained that because of the threat and the telephone call, he feared for his family's safety. Even though the American and Canadian authorities already knew the AISSF agent's name, he felt that "[i]f I sign the paper and he comes to know about it, then he would have my family killed."

The IJ denied Singh's application for asylum and his application for withholding of removal to India. The IJ noted Singh's testimony about his arrests by the Punjabi police, but denied relief because of Singh's refusal to allow access to the Canadian immigration file. He reasoned that the file might bolster the merits of Singh's asylum application by corroborating his use of the name Balwinder Singh and the date of his entry into Canada. On the other hand, the file might reveal claims of persecution or facts inconsistent with Singh's testimony.

Although Singh had testified about the AISSF agent's threat to harm his family, and the alleged phone call from Canadian authorities looking for the agent nearly seven years later, the IJ stressed he did not "see any connection" between the threat, the call, and Singh's refusal to sign a waiver.

> [T]he only conclusion that the Court would draw in this case is that it must make a negative inference regarding the respondent's claim to asylum. That is, it appears to the Court that the respondent may be withholding information from the Court, namely,

information that rests in the Canadian Immigration file.

The IJ used the "negative inference" to undermine all Singh's testimony and other evidence of persecution. He continued:

> This negative inference must extend to the time the respondent states that he spent in Canada. If it extends so far, then it must extend to the date that the respondent gave as the date of his departure from India. If it extends so far, then it must extend to the reasons that might have necessitated, if they did so necessitate, the respondent's departure from India. Additionally, the negative inference must extend actually to the merits of the respondent's claim because, indeed, the Canadian immigration file may contain information contradictory to the information that the respondent has provided to the Court on the substance of his application for asylum.

The IJ then summarily concluded that "[f]or the foregoing reasons," Singh was not eligible for asylum.

The Board of Immigration Appeals affirmed the IJ's decision without opinion. Singh petitioned for review.

When the BIA performs no independent review of the IJ"s decision and instead defers to the IJ, we review the IJ's decision as the final agency action. *San Pedro v. Ashcroft*, 395 F.3d 1156, 1156 (9th Cir. 2005); *He v. Ashcroft*, 328 F.3d 593, 595-96 (9th Cir. 2003). We review the IJ's decision that an alien has not established statutory eligibility for asylum or withholding of removal, including factual findings, under a "substantial evidence" standard. *Zhang v. Gonzales*, 408 F.3d 1239, 1246 (9th Cir. 2005), *citing I.N.S. v. Elias-Zacarias*, 502 U.S. 478, 481 (1992); *Ge v. Ashcroft*, 367 F.3d 1121, 1124 (9th Cir. 2004); *Hartooni v. I.N.S.,* 21 F.3d 336, 340 (9th Cir. 1994).

**Discussion**

We must decide whether substantial evidence supports the IJ's decision that Singh failed to prove his eligibility for asylum under 8 U.S.C. § 1101(a)(42)(A).[2] We hold that it does not. Singh testified at length about incidents of arrest and torture he allegedly suffered because police believed he was a militant separatist. The IJ made no finding as to Singh's credibility, and did not analyze whether his testimony met the burden of proof. Instead, the IJ denied Singh's application solely on the basis of the negative inference he drew from Singh's refusal to release the Canadian records. While the IJ could properly draw a negative inference, he could not stop there. The IJ had to either use the inference to explicitly make an adverse credibility finding, or, under the law of our Circuit, treat all Singh's testimony as true, and analyze the merits of his claim. We hold that the inference alone — more an artifact of legal reasoning than a factual finding — does not constitute "substantial evidence" sufficient to support the denial.

The IJ was plainly entitled to draw a negative inference from the fact that Singh withheld evidence. If the Canadian file in fact related to Singh himself (and not some other Balwinder Singh), it could have bolstered his claims with prior consistent statements about his history of persecution. On the other hand, it could have undermined his claim by contradicting his hearing testimony, or showing he applied for asylum in Canada. The file was ready and waiting, but Singh refused

---

[2]Singh must show he is a person who is "unable or unwilling" to return to his country of origin "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A). He can show he was persecuted or has a well-founded fear of persecution because of a political opinion imputed to him by his persecutors. *Singh v. Gonzales*, 406 F.3d 191, 196 (3rd Cir. 2005), *citing Sangha v. I.N.S.*, 103 F.3d 1482, 1489 (9th Cir. 1997). Singh bears the burden of proof. 8 C.F.R. § 208.13(a) (2003); *Ghaly v. I.N.S.*, 58 F.3d 1425, 1428 (9th Cir. 1995).

to allow access to it, for reasons the judge found unconvincing.

**[1]** A negative inference of some kind was appropriate. "When a party has relevant evidence in his control which he fails to produce, that failure gives rise to an inference that the evidence is unfavorable to him." *Int'l Union, United Automobile, Aerospace and Agric. Implement Workers of Am. (U.A.W.) v. N.L.R.B.*, 459 F.2d 1329, 1336 (1972), *citing* 2 J. Wigmore, Evidence § 285 (3d ed. 1940); *see also Evis Mfg. Co. v. F.T.C.*, 287 F.2d 831, 847 (9th Cir. 1961); 31A C.J.S. Evidence § 167 (2007). The adverse inference rule is a "generally accepted principle of law." *Smith v. United States*, 128 F. Supp. 2d 1227, 1232 (E.D. Ark. 2000). It applies no less in the immigration context. *See*, *e.g.*, *Sidhu v. I.N.S.,* 220 F.3d 1085, 1089-91 (9th Cir. 2000) (immigration judge may draw an inference that readily available testimony not presented would be unfavorable); *United States v. Solano Godines*, 120 F.3d 957, 962 (9th Cir. 1997) (immigration judge may draw an adverse inference from a defendant's silence in response to questioning in civil deportation proceedings).

The IJ's inference was not, as Singh argues, simple speculation or unsupported assumption. While the IJ could not know whether the contents of the Canadian file would contradict Singh's testimony, he was entitled to draw the inference that the evidence would be unfavorable. In doing so, he reasoned from facts, including Singh's refusal to sign the confidentiality waiver, and applied a well-settled principle of legal reasoning.

**[2]** Typically, in the immigration context, a negative inference from a failure to produce readily available evidence goes to the applicant's credibility. In *Sidhu v. I.N.S.*, 220 F.3d 1085 (9th Cir. 2000), we held that an IJ can properly rely on a negative inference from an applicant's refusal to furnish evidence to make an adverse credibility finding. There, the petitioner claimed his father was a witness to many of the facts underly-

ing his claim of persecution, and the sole witness to several events at the core of his asylum application. *Id.* at 1089-90. However, he failed to produce his father to testify on his behalf, even though his father lived with him in a suburb not far from where the hearing before the IJ was held. *Id.* We held that the IJ reasonably drew a negative inference from the failure and used it to make an adverse credibility finding:

> The IJ and BIA might well have inferred that Petitioner knew that his father could not corroborate Petitioner's testimony, and chose not to call him as a witness for that reason. Such an inference would not have been unreasonable. . . . [W]here the IJ has reason to question the applicant's credibility, and the applicant fails to produce non-duplicative, material, easily available corroborating evidence and provides no credible explanation for such failure, an adverse credibility finding will withstand appellate review.

*Id.* at 1091-1092; *see also Guo v. Ashcroft*, 361 F.3d 1194, 1201 (9th Cir. 2004) (same). Failure to produce easily available, material, corroborating evidence "can constitute substantial evidence supporting an adverse credibility determination." *Chebchoub v. I.N.S.*, 257 F.3d 1038, 1044-45 (9th Cir. 2001) (citation omitted); *see also Ladha v. I.N.S.*, 215 F.3d 889, 900 n.11 (9th Cir. 2000); *Kataria v. I.N.S.*, 232 F.3d 1107, 1114 (9th Cir. 2000).

**[3]** But here, the IJ made no credibility finding. Absent an explicit credibility finding, the IJ must accept a witness's testimony as true. *Lopez-Alvarado v. Ashcroft*, 381 F.3d 847, 851 (9th Cir. 2004); *Kalubi v. Ashcroft*, 364 F.3d 1134, 1138 (9th Cir. 2004), *citing Kataria*, 232 F.3d at 1114; *Hartooni v. I.N.S.*, 21 F.3d 336, 342 (9th Cir. 1994).[3] Once the applicant's

---

[3]The dissent claims our reasoning goes astray by assuming Singh testified credibly. We do not. Rather, we follow a well-settled rule of our Circuit.

testimony is deemed true, "the question remaining to be answered becomes whether these facts, and their reasonable inferences, satisfy the elements of the claim for relief." *Ladha,* 215 F.3d at 900.

[4] The IJ, therefore, had to choose one of two alternatives. He could either make an explicit credibility finding, or take Singh's testimony — both as to his persecution in India and his entry into Canada and the United States — as true, and determine whether he proved past persecution and a well-founded fear of future persecution on account of a political opinion imputed to him. *See Ochoa v. Gonzeles*, 406 F.3d 1166, 1171-72 (9th Cir. 2005) (elements of proving persecution on the basis of imputed political opinion); *Sangha v. I.N.S.*, 103 F.3d 1482, 1487-89 (9th Cir. 1997) (same); *Jibril v. Gonzales*, 423 F.3d 1129, 1133 (9th Cir. 2005) (burden generally). He could not deny the asylum application on the basis of the inference alone.

Our rules concerning corroborating evidence compel our conclusion as well. This Court has repeatedly held that the BIA may not require independent corroborative evidence from an asylum applicant who testifies credibly in support of his application. *Kataria*, 232 F.3d at 1113; *Ladha*, *supra.* Simply faulting such an applicant for failure to provide potentially corroborating evidence is "not a substitute for substantial evidence." *Karouni v. Gonzales*, 399 F.3d 1163, 1173-74 (9th Cir. 2005).

[5] Again, without a credibility determination, the IJ was required to treat Singh's testimony as true. Yet he penalized Singh for his refusal to allow access to potentially corroborating evidence, negating all his testimony by force of logic alone. The IJ's broad use of the "negative inference" was therefore the functional equivalent of demanding corroborating evidence. If we were to allow such an inference to determine the outcome of a case where there is no adverse credibility determination, even an applicant deemed to testify

credibly could never meet his burden if he withheld evidence, or failed to supply readily available evidence. That result would conflict with our rule that "[o]nce an applicants testimony is deemed credible" (as Singh's must be here) "no further corroboration is required to establish the facts to which the applicant testified." *Karouni*, 399 F.3d at 1174. The IJ can use lack of corroborating evidence to undermine Singh's claim only if Singh's testimony is less than credible. *See Lin v. Gonzales*, 472 F.3d 1131, 1132 (9th Cir. 2007); *Sidhu, supra.*[4]

**[6]** We acknowledge that there are other contexts in which an adverse inference from a party's refusal to produce evidence can appropriately be used as an ultimate sanction. *See, e.g.,* Fed. R. Civ. P. 27(b)(2)(A-C) (as sanctions for refusal to produce evidence, court may establish facts in accordance with claim of opposing party, order that a party cannot support a designated claim or defense, or strike pleadings). But doing so here, without the findings and analysis we require, would run afoul of our rules that both assure immigration decisions are reviewable, and recognize the special obstacles to proof that many asylum applicants face. We do not require corroborating evidence in the face of credible testimony because "authentic refugees" are so rarely able to provide direct corroborating evidence. *See, e.g., Ladha*, 215 F.3d at

---

[4]We note that several other Circuits would reach the same conclusion, even though their rules regarding corroborating evidence differ. The Second Circuit, for example, *does* allow the IJ or BIA to deny an application for asylum for lack of corroborating evidence, but requires the adjudicator to make an explicit credibility finding to do so. The adjudicator must specifically identify the relevant, ostensibly missing documentation, *see Qiu v. Ashcroft*, 329 F.3d 140, 153 (2nd Cir. 2003), and (1) rule explicitly on the applicant's credibility; (2) explain why it is reasonable to expect additional corroboration in the particular case; and (3) assess the sufficiency of the applicant's explanation for the absence of corroborating evidence. *Diallo v. I.N.S.*, 232 F.3d 279, 285-90 (2nd Cir. 2000). The Eighth Circuit similarly requires the IJ or BIA to rule explicitly on the applicant's credibility. *See Eta-Nadu v. Gonzales*, 411 F.3d 977, 984 (8th Cir. 2005) *and cases cited therein*. The Seventh Circuit does the same. *See Zheng v. Gonzales*, 409 F.3d 804, 810 (7th Cir. 2005).

899-901; *Shire v. Ashcroft*, 388 F.3d 1298-99 (9th Cir. 2004). And, as set out above, the inference to be drawn from an applicant's *refusal* to provide readily available evidence (as opposed to a simple failure to provide corroborating evidence) stems in large part on an assessment of the applicant's knowledge, intent, and veracity, and so goes more appropriately to the applicant's credibility than to the merits of his or her claim. While the "extent" of an inference is difficult to review, we have well-developed substantial evidence standards for reviewing credibility findings. *See, e.g., Mendoza Manimbao v. Ashcroft*, 329 F.3d 655, 658, 660 (9th Cir. 2003) (credibility findings must be sufficient for review); *Don v. Gonzales,* 476 F.3d 738, 741 (9th Cir. 2007) (reasons for adverse determination cannot be peripheral); *Ge v. Ashcroft*, 367 F.3d 1121, 1126 (9th Cir. 2004) (no reliance on non-evidence-based assumptions); *Lin v. Gonzales*, 434 F.3d 1158, 1160 (9th Cir. 2006) (reasons may not be based on suspicions, speculation, or conjecture); *Singh v. Gonzales,* 439 F.3d 1100, 1108 (9th Cir. 2006) (adverse determination may not be based on minor inconsistencies). We must join other Circuits in observing that the absence of an explicit credibility finding here frustrates appellate review. *See Soumahoro v. Gonzales*, 415 F.3d 732, 736 (7th Cir. 2005); *Diallo v. I.N.S.*, 232 F.3d 279, 287 (2nd Cir. 2000).

**[7]** Because the IJ neither made credibility findings nor analyzed Singh's testimony to see if he meets the criteria for asylum, we remand the case to the Board for further proceedings consistent with this opinion. *See Hartooni v. I.N.S.*, 21 F.3d 336, 343 (9th Cir. 1994) (remanding where IJ raised doubts about applicant's credibility but made no express adverse credibility finding). On remand, the Board may remand the matter to the IJ to conduct a "full and fair" inquiry into Singh's credibility and issue a legally sufficient credibility determination. *See Mendoza Manimbao v. Ashcroft*, 329 F.3d 655, 661 (9th Cir. 2003). Alternately, the Board can accept Singh's testimony as true and determine whether he

has met his burden of proof for asylum and withholding of removal.

REMANDED.

RAWLINSON, Circuit Judge, dissenting:

I respectfully dissent. In my view, the majority errs by shoehorning this case into an adverse credibility analysis. The majority goes astray, in my view, by characterizing this case as one where the Immigration Judge (IJ) required Singh to provide corroborating evidence despite the presentation of credible testimony by Singh. There are two fallacies inherent in that characterization: 1) that Singh gave credible testimony and, 2) that the IJ required the production of corroborating evidence. Rather, the record reflects that the IJ was unable to assess Singh's credibility due to Singh's obstructionist conduct.

At his hearing on April 15, 2002, Singh testified that an agent from the All-India Sikh Student Federation gave him a passport in the name of Sohan Lalf when they left India. He further testified that before the flight arrived in England, the agent gave Singh a passport bearing Singh's name, which Singh used to enter Canada.

At his prior hearing on June 4, 2001, Singh never mentioned being given his own passport to enter Canada. To the contrary, Singh left the IJ with the distinct impression that he used the name Sohan Lalf to enter Canada. This impression was consistent with the statement on Singh's application that he "travelled [sic] on another's passport to Canada."

The reason for Singh's dissimulation and inconsistency became apparent when the government reported the result of its inquiry to the Canadian immigration agency. Indeed, the

Canadian government had an immigration file under the same name as Singh's and with the same date of birth. Despite the obvious importance of the Canadian immigration file to the proceedings in this country, Singh refused to sign a waiver that would allow access to the Canadian immigration file. The importance of this file cannot be overstated. The contents of the file would either have confirmed Singh's tale of persecution or given the lie to his claims.

The reasons Singh gave for refusing to sign the confidentiality waiver were significant factors in the IJ's decision to draw the negative inference resulting in denial of Singh's application. Singh testified that the agent "who brought [him] here," threatened to kill Singh's family if Singh told anyone about the agent. Singh also stated that sometime in the year 2000, he received a call on his cellular telephone from a person identifying himself as a Canadian immigration official. This person reportedly asked Singh about the agent who brought Singh to Canada, advising Singh that he "should tell them that it was he who brought [Singh] there." Singh testified that he told the person on the telephone that he knew the agent, but denied knowing the whereabouts of the agent.

Singh's testimony revealed that he had no contact with the Canadian immigration system between 1994 and the alleged telephone call in 2000, raising the question of why Canadian officials would contact him so long after his involvement with that system. Neither could Singh explain how the Canadian immigration official would have obtained Singh's cellular telephone number. Singh's flimsy explanation for his refusal to grant access to the Canadian immigration file reinforced the IJ's decision to draw a negative inference resulting in denial of Singh's asylum request.

The majority opinion acknowledges the appropriateness of drawing a negative inference from Singh's refusal to permit access to the Canadian immigration file. However, the majority opinion, without citation to any guiding authority, limits

the use of that negative inference to making a finding of adverse credibility. I respectfully disagree.

Pursuant to 8 C.F.R. § 208.13, "[t]he burden of proof is on the applicant for asylum to establish that he or she is a refugee as defined in section 101(a)(42) of the Act . . ." The IJ must determine whether the evidence satisfies the Petitioner's burden to prove "the elements of the claim for relief." *Garcia-Martinez v. Ashcroft*, 371 F.3d 1066, 1074 (9th Cir. 2004) (citation omitted).

It is "a generally accepted principle of law" that "an adverse inference may arise from the fact of missing evidence." *Smith v. United States*, 128 F. Supp. 2d 1227, 1232 (E.D. Ark. 2000). Moreover, "[t]he failure to bring before the tribunal some circumstance, document, or witness, . . . serves to indicate, as the most natural inference, that the party fears to do so, and this fear is some evidence that the circumstance or document or witness, if brought, would have exposed facts unfavorable to the party." *International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (UAW) v. NLRB*, 459 F.2d 1329, 1336 (D.C. Cir. 1972).

"The theory behind the rule is that, all other things being equal, a party will of his own volition introduce the strongest evidence available to prove his case. If evidence within the party's control would in fact strengthen his case, he can be expected to introduce it[.]" *Id.* at 1338. "Conversely, if such evidence is not introduced, it may be inferred that the evidence is unfavorable to the party suppressing it[.]" *Id.* Allowing an adverse inference to be drawn for failure to produce relevant evidence "plays a vital role in protecting the integrity of the administrative process[.]" *Id.*

This evidentiary presumption has arisen in various civil contexts. For example, in *Norfolk and Western Railway Co. v. Transportation Communications International Union*, 17

F.3d 696, 701 (4th Cir. 1994), the Fourth Circuit determined that it was permissible for the arbitration board to draw an adverse inference from a party's refusal "to comply with a Board request for additional evidence."

Additionally, in a products liability case, the Third Circuit found that "[t]he unexplained failure or refusal of a party to judicial proceedings to produce evidence that would tend to throw light on the issues authorizes, under certain circumstances, an inference or presumption unfavorable to such party." *Gumbs v. International Harvester, Inc.*, 718 F.2d 88, 96 (3d Cir. 1983) (citations omitted).

In *Zapex Corp. v. NLRB*, 621 F.2d 328, 334 (9th Cir. 1980), the Board challenged the administrative law judge's (ALJ) "fail[ure] to draw an adverse inference from (the companies') failure to produce subpoenaed records[.]" Although we did not ultimately decide whether the ALJ failed to apply the negative inference rule, we did conclude that "in view of [the party's] failure for reasons of inconvenience alone to produce relevant documents, [this] supports, if not an application of the 'adverse inference' rule, at least a finding that the appellants did not carry their burden of proof." *Id.*

The IJ's similar conclusion in this case — that Singh's refusal to provide access to the Canadian file resulted in a failure of proof — is consistent with the most analogous authority that exists on this issue. In contrast, the majority's conclusion that the IJ was required to make an adverse credibility determination in this circumstance is not supported by citation to a single case. Rather, the cases cited in the majority opinion address failure to produce corroborating evidence. *See, e.g., Sidhu v. INS*, 220 F.3d 1085, 1089-90 (9th Cir. 2000) (holding that an adverse inference was permissible when the Petitioner failed to produce corroborating evidence). However, *Sidhu* and comparable cases are not dispositive for two reasons: 1) *Sidhu* and similar cases merely hold that an adverse credibility determination is permissible when easily

available corroborating information is not produced. Those cases do not purport to hold that the IJ is limited to making an adverse credibility determination and has no other options and, 2) as the IJ noted, we do not know whether the evidence would be corroborating or disqualifying. The latter reason highlights the philosophical weakness in the majority disposition. The majority would allow asylum applicants to blatantly refuse to permit immigration authorities to perform a complete investigation into the applicant's eligibility for asylum. I emphasize that the immigration officials were not seeking to compel Singh to produce anything. Rather, the government merely requested that Singh authorize the government to gather this vital information itself. We should not reward those who deliberately thwart the administrative processes we have established to assess eligibility for asylum. As our cases reflect, adverse credibility determinations meet with varying results on review. *Compare Turcios v. INS*, 821 F.2d 1396, 1400 (9th Cir. 1987) (reversing the IJ's determination that the petitioner "did not establish his credibility due to his evasiveness in answering questions"); *with Wang v. INS*, 352 F.3d 1250, 1256-57 (9th Cir. 2003) (upholding the IJ's adverse credibility determination on "obvious evasiveness"). The option of concluding in an appropriate case that denying access to information that well might be dispositive justifies denial of the application promotes respect for the administrative tribunal, fosters finality and injects a measure of certainty. For these reasons, I would not require an adverse credibility determination under the facts of this case. I would uphold the IJ's determination that Singh's blatant refusal to allow access to the Canadian immigration file warranted a determination that he failed to carry his burden of proof.